# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-CA-01119-SCT

*MIDSOUTH RAIL CORPORATION*

*v.*

*VICTOR J. O'CONNOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/92 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| | SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | GEORGE H. RITTER |
| | CHARLES T. OZIER |
| ATTORNEYS FOR APPELLEE: | C.E. SOREY, II |
| | WILLIAM W. RAMSEY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 3/21/96 |
| MOTION FOR REHEARING FILED: | 4/4/96 |
| MANDATE ISSUED: | 5/23/96 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. MidSouth Rail Corporation appeals a judgment rendered against it in the First Judicial District of Hinds County for $70,000 in favor of Victor J. O'Connor following a retrial granted by the circuit judge after the first trial resulted in a jury verdict in favor of MidSouth Rail Corporation. The new trial was granted on the basis of a remark in defense counsel's opening statement, to which plaintiff's counsel objected. The court had sustained the objection, and plaintiff's counsel did not ask for either a mistrial or that the jury be instructed to disregard the statement. No further complaint was made concerning the opening statement remark until plaintiff's motion for a new trial following a jury verdict and judgment in favor of MidSouth.

¶2. Because we find the circuit court abused its discretion in granting a new trial, we reverse and render, reinstating the judgment for the defendant.

## FACTS

¶3. MidSouth Rail Corporation (MidSouth) is a Mississippi corporation with principal offices in Jackson, engaged in operating a railroad.

¶4. On July 20, 1987, around 10:00 a.m., O'Connor was working as a switchman for MidSouth in its rail yard in Jackson. He was 50 years old, had been working for a railroad company since 1961, and for MidSouth since 1986 following its purchase of some of the Illinois Central Gulf Railroad's line. His wife, Mrs. O'Connor, was employed as an x-ray technician for the University Hospital. They had one grown son.

¶5. The other members of the train crew that morning were M. C. (Matt) Nussbaum, the engineer, and J. R. Buckley, the brakeman. O'Connor was riding on the side of the engine when he heard Buckley over the short-wave radio exclaim a rail switch was improperly set. O'Connor jumped from the engine onto the track, injuring his left foot. Buckley was mistaken, the switch was correctly set and no collision or derailment was imminent when Buckley yelled.

¶6. O'Connor took some aspirin for the pain, and continued working. He signed an accident report that day, filling in "Nature of injuries" as "Left foot -- heel." When he got home, he noticed that the bottom of his left foot was bruised. It was tender, and pain radiated up his leg. He soaked his foot in salted hot water, and thought he had sustained a stone bruise. He continued working and two months later in September, after working hours, he went to see Dr. Frazier Ward, an orthopedic surgeon with the University Hospital. Dr. Ward told him to continue soaking his foot, and gave him a rubber cushion pad which fit around the heel. He returned to Dr. Ward October 20, who recommended that he wear cowboy boots, but O'Connor told him this was not permitted by regulations.

¶7. According to O'Connor, he continued seeing Dr. Ward until December 1988 when the latter had a heart attack. Subsequent to this, according to O'Connor, he began seeing Dr. James Hughes, an orthopedist, January 23, 1989, who administered cortisone shots to his heel. From July 20, 1987, until September 1989, O'Connor worked full time with the railroad.

¶8. O'Connor testified he did not report any of this treatment to his company supervisors until the last week in August, 1989, when he was off four days. Bruce Coffey, superintendent, telephoned him at home on a Sunday, asking him why he had not reported this problem before. According to O'Connor, he had not reported it because a surgical procedure which Dr. Hughes had recommended would end his railroad career. Coffey informed him that this was serious, and he would have to talk with O'Connor's doctor. Then, the following Friday, Coffey "relieved me of my duty, . . . [H]e pulled me out of services we call it."

¶9. According to O'Connor: "Because he said I was -- it came to light that I was quarrelsome and troublesome to a customer, a Southern Beverage customer and impending an investigation into the matter I was suspended from service."

¶10. MidSouth during this period did in fact receive several complaints about O'Connor. A handwritten complaint, dated September 11, 1989, from David Tyson, complained, "I have seen Mr. O'Connor several times on our dock and he always seems to have an attitude problem. He tends to be arrogant and overbearing as if Weyerhaeuser doesn't do things to suit him." There were also two written complaints from Southern Beverage Co., a Jackson customer, one dated September 6, complaining O'Connor had an attitude problem and seemed to think the railroad was doing Southern Beverage a favor in doing business with them. The other, dated September 8, 1989, was detailed. It charged him with coming into the company warehouse on one day and in a distracting manner yelling at the manager from 100 feet away that

the gate was locked and that it better not happen again. Upon another occasion O'Connor came in because the grass was high, and even though the company was in the process of mowing it, threatened them with no more stops. Upon another occasion O'Connor came in "yelling" about a truck which did not belong to Southern Beverage being on the track. O'Connor had other problems with Southern Beverage in which he was "neither businesslike or professional." Finally, Eddie Pierce, the warehouse manager and author of the complaint stated, while O'Connor had been"very positive" when they first started doing business, his attitude was reversed, he was rude, and did not respect Southern Beverage as a customer. And, if MidSouth had any more complaints to make of Southern Beverage, it should be done "by an officer of MidSouth and not by Mr. O'Connor."

¶11. Yet another complaint dated September 8, 1989, was received from Glen Baker, vice president of Southern Grain. It charged O'Connor threatening MidSouth's service to the grain company because it had made a telephone call to the downtown office of MidSouth requesting rail switches to Southern Grain's business. Baker said O'Connor had the wrong attitude, and he wanted MidSouth to be aware of it.

¶12. There was also a complaint by a fellow worker.

¶13. O'Connor testified that on October 9, 1989, following a MidSouth investigation, he was "terminated." Following an appeal process, he was reinstated September 28, 1989.

¶14. Under the Railway Labor Act, an aggrieved labor union member can have a hearing before a three-member "public law board" composed of a representative of the union, the employer, and a neutral person. By order number 8, dated September 16, 1990, the board unanimously found that on August 15, 1989, O'Connor over the radio asked B. J. Carpenter, the engineer, "where is my nigger?," referring to P. W. Johnston, a white brakeman. This was followed with, "if he's still on the engine, beat him off with that air brake handle." Johnston said that this was not an isolated incident, and that he was changing job assignments on September 5, 1989. The board further found that O'Connor, in acknowledging he had made the statements, said he had made them in jest, and apologized for doing so. The board found that O'Connor's conduct, while not appropriate and "exhibited extremely poor judgment," did not merit his 60-day suspension, but because of other matters involving O'Connor before the board, his only remedy would be expunging the mention of discipline from his work record. He was reinstated without pay for time lost. The MidSouth member dissented to the removal of discipline from his work record.

¶15. It should be noted that the above order is part of the record as an identification exhibit, the circuit court excluding its introduction into evidence before the jury.

¶16. Board order number 9 dated September 16, 1990, found that MidSouth's determination that O'Connor was "uncivil, quarrelsome, and belligerent in his dealings with the carrier's customers" was supported by the facts, was a "serious violation of the rules." It noted that the "carrier competes in an environment which is paramount for the carrier to provide excellent service and cultivate good will with its customers. Accordingly, the carrier cannot be expected to retain employees who do not embrace the carrier's objectives." The order recited that O'Connor's removal from service was justified: "however, the Board, believes that the claimant should be given the opportunity to return to the carrier's service and demonstrate that he can be a responsible employee." The order further required him to serve six months working as a brakeman or trainman, and not to be allowed to work as a conductor until after six months' service.

¶17. On September 18, 1990, Hugh Salmons, vice president and chief transportation officer of MidSouth, wrote O'Connor to report for a physical examination to a Dr. Easterling in Vicksburg. There was no response, and Salmons wrote him again on October 15, giving him three days to report. O'Connor was then examined by Dr. Easterling, who reported he was not qualified to return to work. Several months later MidSouth again requested O'Connor to be examined to see if he was qualified to return to work as a conductor. According to Salmons, he refused to make the appointment.

¶18. On July 26, 1991, O'Connor was offered a desk job as assistant purchasing agent for MidSouth in Vicksburg, which he refused. O'Connor testified the reason he did so was because this was a "management" job not covered by the union contract, and he distrusted Salmons, who might fire him at any time. Salmons had, subsequent to the offer, written O'Connor's attorney that he would stipulate in the employment contract that O'Connor could not be discharged except for unsatisfactory job performance. The job paid $35,000 per year, and generally there was a ten percent annual bonus with all management positions. There would be a break-in period, following which the offered desk job would entail answering the telephone, taking and placing orders, taking inventory, and stocking light material. The job had the same medical benefits as the union job.

¶19. O'Connor, who a number of years previously qualified as an x-ray technician, on January 22, 1990, applied for a job with the Vicksburg Hospital. On his application he wrote that he had no job disqualifications, and wrote nothing about any foot problem being involved in his leaving MidSouth. He was employed by the hospital, and worked from March through the remainder of 1990.

¶20. On June 26, 1990, O'Connor filed a complaint against MidSouth in the circuit court of the First Judicial District of Hinds County for his foot injury. In it he asked for $750,000 damages for his injury, and an additional $500,000 damages for pain and mental anguish, making a total of $1,250,000. MidSouth admitted the July 20, 1987, incident, but denied, and later at trial hotly disputed O'Connor having sustained a disabling injury of any kind.

¶21. The first trial began September 25, 1991. In this trial, as above set out, O'Connor claimed he was suspended and then discharged because of an injury sustained July 20, 1987. The basis for the new trial was a sentence in the opening statement of defense counsel. In order to understand the context in which the statement was made, we quote extensively from the opening statements of both the plaintiff and the defense.

> And then in August of 1989, when he got this -- an injection, went back and he had to take off four days. First time he'd ever taken off -- four days -- because his pain was so bad. The proof will further show that on a Sunday after he'd been off for four days, that his superintendent or one of the officials called him at home, woke him up, and wanted to know why. And at that point in time, he advised the official that the doctor had recommended that he seriously consider surgery and that he might not ever be able to railroad again.

> Now, about one week after that, the railroad cited him for an investigation for being discourteous to a customer. One week after that. They held the investigation and fired him for being discourteous to a customer. (Emphasis added.)

> The proof will further show, ladies and gentlemen, that Mr. O'Connor was terribly upset about this. It came just a week or so after he had advised them of -- having to be off for four days, so he appealed that and in the final analysis -- he was off then -- he was off, fired, for a year. In the final analysis

through the Railroad Adjustment Board, which is the method of appeal, the Railroad Adjustment Board said, "You're wrong," and they put him back to work.

Now, the proof will further show that when the Railroad Adjustment Board put him back to work, he wanted to go back; that he went back to mark up. The proof will further show that they sent him then to a company -- company Dr. Easterling in Vicksburg for a physical examination and that Dr. Easterling, in railroad language, bad ordered him, disqualified him because of this injury and he couldn't go back to the railroad.

So Mr. O'Connor then brought this lawsuit to recover for this loss that he had sustained. . . .

The defense opening statement responded:

If he'd been injured severely or had a real problem, there were many doctors he could have gone to see. Yet he waited over two months before he went to see a doctor, a doctor up at the University Medical Center where his wife works.

During the next approximate two-year period of time, he continued to work for two years as a conductor, performing all of his normal duties, getting on and off trains, doing all the duties, working a full-time job. During that period of time, the medical records show that he saw either Dr. Ward or Dr. Hughes approximately five or six times during that two-year period. He was never hospitalized for any problems with his foot. He never had surgery for any problems with his foot.

Now, in September of 1989, which was over two years after this accident -- he had been working full time -- several things that happened and you're gonna hear testimony about this where he had a dispute with MidSouth and MidSouth had a dispute with him. He caused a car to derail. He was suspended. He was involved in an incident involving some racial slurs that caused him to get suspended. He was involved in an incident with some customers where his attitude was very belligerent to a number of customers with the railroad that caused him to lose his job for a year.

BY MR. RAMSEY:

The Court please, I'm -- dislike to disrupt the statement, but the remark of counsel about racial slurs is nowhere in this record and I think it's highly inappropriate for him to make those remarks.

BY THE COURT:

Yes.

BY MR. OZIER:

Your Honor, Mr. Ramsey raised the point of his suspensions and terminations and I think is -- goes to the issue of damages --

BY THE COURT:

Let's move along. We'll take this up out of the presence of the jury.

BY MR. OZIER:

Because of his attitude that he showed to a number of customers and the fact that the railroad has to -- has to get along with its customers, he was terminated. Now, he filed an appeal of that termination to what's known as the Public Law Board and that is allowed under the law for him to appeal to get his job back and to get back wages back. And you'll hear testimony and you'll see the order of the Public Law Board that said that the railroad was justified in terminating him. That's what the order says. The order also says that in the eyes of the law board it felt he deserved a second chance. So he was given a second chance. . . .

¶22. As the record reflects, plaintiff's counsel did not move for a mistrial or ask that the jury receive any cautionary instruction from the court.

¶23. During trial, after O'Connor had testified on direct examination, and just prior to any cross-examination, plaintiff's counsel made a motion *in limine* that defense counsel be precluded from questioning O'Connor about any infractions committed by him during his work other than being quarrelsome and abusive to customers for which he was terminated. Defense counsel responded, and we quote the extended colloquy between counsel and the court.

BY MR. OZIER:

The incidents that we want to refer go directly to the issue of damages, and Mr. Ramsey has done a very good job trying to get the Jury to infer, based on the Plaintiff's direct examination, that we fired or terminated this man because of his injury. There are three incidents where the Plaintiff -- two of which the Plaintiff was suspended from work without pay from September the 23rd of '89 through October the 22nd of '89, October the 22nd of '89 through December 20, '89, and the termination was from October 5, '89 until the date of the reinstatement of September the 16th of 1990. I think all three of these incidents -- two of them involve suspensions, one of them involves a termination; it goes to the issue of damages as to whether or not he was receiving any money or whether or not he could receive any pay at that time, because the Public Law Board adjudicated in the termination that he was not entitled to back pay during that period of time; therefore, he cannot recover back pay while he was terminated or suspended --

BY MR. RAMSEY:

We're not claiming that.

BY MR. OZIER:

Well, unless I can get into this, this goes directly to the issue of damages.

BY MR. RITTER:

Judge, may -- may I add something? Mr. Ramsey has also done a fairly effective job of putting up -- putting forth and inferring to the Jury that Mr. O'Connor was terminated in response to this lawsuit or in response to a potential lawsuit and that -- that's harassment. And he sat there and he pointed at Mr. Salmons and said, "Because I don't trust that man." Well, if he was suspended twice before he was terminated, then those suspensions are relevant and the reasons for those suspensions are relevant.

BY THE COURT:

Well, of course, the subject matter of the suspension would not -- would probably not be relevant any way. If the termination -- the charge of the termination contains that suspension is part of the -- is part of the reasons for his final termination, then you might have an argument. But, as I understand it, the reason he was terminated is for the -- is for discourtesy to one of the customers. Is there some other charge in that -- in that termination document that --

BY MR. RAMSEY:

No, sir.

BY MR. OZIER:

No, sir. The only charge in the termination document, and I think it's about three pages here -- I've got some things clipped to it -- that goes from October the 5th of '89 to September the 16th of '90. Now, before that, he was discharged -- rather suspended in September of 1989 that went before that without pay.

BY THE COURT:

Well, you are certainly entitled to show that if they're claiming that as damages -- that period as damages, you're certainly entitled to show that he is not entitled to it, but Mr. Ramsey represents --

BY MR. RAMSEY:

No, sir --

BY THE COURT:

-- they're not asking for --

BY MR. RAMSEY:

We are not asking for that. And -- and the other thing -- I think the record oughta be clear --

BY THE COURT:

And I understand that this has some kind of racial connotation --

BY MR. RAMSEY:

Yes, sir --

BY THE COURT:

-- and we're just not going to -- those are always far more prejudicial than they are probative, and I'm not -- you know, you've already mentioned something about that to the Jury --

BY MR. RAMSEY:

And I objected to it.

BY THE COURT:

Well --

BY MR. RAMSEY:

For the record.

BY THE COURT:

Well, yes, I understand, but I -- I -- we're just not going to get into something like that. We just --

BY MR. OZIER:

Your Honor, let me ask the Court this. The witness has gone into details about why he was discharged or terminated --

BY THE COURT:

Yes, sir, and you certainly may go into the details also of why he was.

BY MR. OZIER:

Okay. All right.

BY THE COURT:

But it's confined within the doc -- that document that charges him, and you're certainly not going to be able to pick out of the -- out of his employment record other -- other incidents that are not part of the charging document there.

BY MR. OZIER:

Okay. Then I will stick to the document that relates solely to his discharge, which deals with uncivil, quarrelsome, and belligerent conduct with -- with MidSouth customers.

BY THE COURT:

Yes, sir. You're certainly entitled to do that.

BY MR. RAMSEY:

We have no problem with that.

¶24. After the plaintiff had rested, Hugh Salmons testified for the defense, and during the course of his examination, plaintiff's counsel objected to the introduction into evidence before the jury of public law board orders dealing with O'Connor's suspension other than public law board finding number 9 above quoted, and correspondence from customers. The correspondence and public law board finding number 8 above noted were introduced into evidence for identification, but were never admitted before the jury.

¶25. When both sides had rested defense counsel again unsuccessfully attempted to offer these documents

into evidence, stating: "[T]he Plaintiff has attempted throughout this trial to infer that the Defendant had no justification to dismiss the Plaintiff; that it was simply a personal vendetta on the part of the railroad, and particularly Mr. Hugh Salmons; and that these two other suspensions were definitely relevant to that issue."

¶26. Plaintiff's counsel made no further mention of the objection he had made during defense counsel's opening statement during the course of the trial. On September 26, 1991, the jury rendered a verdict in favor of MidSouth, and on September 27, 1991, the circuit court entered a judgment for the defendant.

¶27. On October 3, 1991, the plaintiff made a motion for a new trial, and in addition to other grounds asserted for a new trial, counsel argued that plaintiff was entitled to a new trial because of the opening statement of defense counsel mentioning "'racial slurs' in dealing with Defendant's customers."

¶28. On January 13, 1992, the circuit judge entered an order granting a new trial because of "the highly prejudicial nature of the comments made by Defendant's counsel during Defendant's opening statement at the trial concerning racial slurs allegedly made by the Plaintiff."

¶29. The circuit judge granted MidSouth's motion for an interlocutory appeal, which we thereafter refused to entertain.

¶30. Following a retrial on September 30, 1992, there was a jury verdict for the plaintiff and judgment thereon for $70,000, from which MidSouth has perfected this appeal.

## LAW

¶31. The sole issue presented on this appeal is whether or not the circuit judge abused his discretion in granting a new trial based upon one sentence in the opening statement of defense counsel. In reciting several reasons why O'Connor had been suspended, defense counsel stated one was: "He was involved in an incident involving some racial slurs that caused him to get suspended." Plaintiff's counsel objected on the ground that "the remark of counsel about racial slurs is nowhere in this record and I think it's highly inappropriate for him to make those remarks."

¶32. The circuit judge agreed and told counsel to move along, "We'll take this up out of the presence of the jury."

¶33. The matter was never again brought to the attention of the court during the entire course of the trial. In his motion *in limine* counsel never referred to the statement, and all the jury ever heard was this one sentence made during defense counsel's opening statement. The jury was not told what slurs were made. The sentence does not even state that O'Connor himself made the slurs. The jury was not given the nature or circumstance of the "racial slurs."

¶34. It should also be noted that plaintiff's counsel did not object to any incident involving racial slurs because of relevancy, but because they were "nowhere in this record."

¶35. Indeed, once O'Connor claimed that he was suspended or fired because of his injury and not for other reasons, it was relevant for MidSouth to show that there were other good and sufficient reasons why he was disciplined, including his offensive language involving race. It was certainly within the realm of argument for defense counsel to attempt to introduce this incident involving Johnston as a basis for disciplining O'Connor.

### Rule 401. Definition of "Relevant Evidence"

"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

M.R.E. 401.

¶36. Even if not relevant, however, it is difficult to see how a general statement such as made by defense counsel, before any testimony, with no specifics whatever, and to which the Court in effect sustained an objection was of sufficiently serious nature to justify a mistrial. Even if it were, however, it most certainly was incumbent upon plaintiff's counsel to then and there move for one. At the very least, he should have asked that the circuit judge caution the jury to disregard the statement by defense counsel. Plaintiff's counsel did none of this. Instead, he waited until an adverse jury verdict was returned before ever voicing any further complaint. If courts were to countenance this, there would be no need for counsel on either side to ever voice an objection or ask for a cautionary instruction or mistrial until the roll of the dice had been complete and counsel came up craps.

¶37. When an error is made, it is incumbent upon opposing counsel to then and there voice an objection, and if sustained move for the appropriate relief. If plaintiff's counsel had thought the remark made by defense counsel warranted a mistrial, the time to have made it was when the remark was made. That would have been the time for the trial court to rule, with the circumstances very fresh upon the court's mind.

¶38. Of course, our decisions require counsel to ask for relief commensurate with the error, not following trial, and failure to do so cures the error. *Marks v. State*, 532 So. 2d 976, 981 (Miss. 1988); *Simpson v. State*, 497 So. 2d 424, 431 (Miss. 1986); *see also Foster v. State*, 639 So. 2d 1263 (Miss. 1994), *cert. denied* 131 L. Ed. 221, 115 S. Ct. 1365, 63 U.S.L.W. 3960 (U.S. 1995).

¶39. Although this was an F.E.L.A. action, procedure is governed by state law. *Missouri Pacific R. Co. v. Whitehead*, 862 S.W. 632, 636 (Tex. 1993); *Chapman v. Union P. Railroad*, 467 N.W.2d 388, 393, 237 Neb. 617, 622 (Neb. 1991).

¶40. We therefore reverse and render, reinstating the judgment for the defendant.

¶41. **REVERSED AND RENDERED.**

**PRATHER, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J.**

**McRAE, JUSTICE, DISSENTING:**

¶**42.** Because the majority diverges from the applicable standard for reviewing a motion for a new trial, I must respectfully dissent. The trial judge is given broad discretion in his decision to grant or deny a new trial. *Bland v. Bland*, 629 So. 2d 582, 586 (Miss. 1993); *Meena v. Wilburn*, 603 So. 2d 866, 877 (Miss. 1992); *Burnham v. Tabb*, 508 So. 2d 1072, 1075 (Miss. 1987). This Court is without power to reverse

the trial judge in his ruling on a motion for a new trial absent an abuse of discretion. *American Fire Protection, Inc. v. Lewis*, 653 So. 2d 1387, 1390 (Miss. 1995); *Kitchens v. Mississippi Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989). A trial judge may grant a new trial on its own motion in the absence of a contemporaneous objection or on grounds not included in a party's motion for a new trial. *City of Jackson v. Copeland*, 490 So. 2d 834, 837 (Miss. 1986).

¶43. The majority reverse the decision to grant a new trial on the basis that the plaintiff failed to move for a mistrial subsequent and in addition to his entry of a timely objection. However, a trial judge has authority to grant a new trial at any time he is convinced that the jury has resorted to bias, passion and prejudice. *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 714-16 (Miss. 1984). A contemporaneous objection is not even required if the jury has resorted to external factors in rendering a verdict. *Copeland*, 490 So. 2d at 837. Accordingly, the absence of a motion for a mistrial did not diminish the inherent power of the trial judge to grant a new trial in the case at hand.

¶44. Not only did the trial judge have the authority to grant a new trial in this case, but the record demonstrates a compelling reason for having done so. The defense opened its case with reference to alleged racial slurs made by O'Connor while at work. The plaintiff made a contemporaneous objection, but not until later in the proceedings during a motion in limine, did the trial judge sustain O'Connor's objection to this evidence.[1] This evidence was ultimately ruled inadmissible because its probative value was substantially outweighed by its prejudicial effect. Thus, the lower court's failure to deal with the objection during opening statements left the jury to ponder over the allegations of racial slurs throughout much of the trial.

¶45. This Court has determined as a general rule that insurance should not be mentioned to a jury because of its highly prejudicial effect on the jury's willingness to award damages. *West Cash & Carry Bldg. Materials v. Palumbo*, 371 So. 2d 873, 876 (1979). Any direct allegation at trial that a party is racially prejudiced will almost assuredly have a similar effect, especially if the jury allowed to maintain such an image of that party throughout most of the trial. The trial judge is best positioned to determine whether comments have prejudiced the jury since he is charged with monitoring the trial as it progresses. *Palumbo*, 371 So. 2d at 876. The jury in the case at bar was permitted to retain an odious image of the plaintiff throughout most of the trial without any evidence being introduced to support it. Consequently, the grant of a new trial can not constitute an abuse of discretion.

¶46. The trial judge had the inherent authority to grant a new trial in this case as he was in the best position to determine that the jury verdict was the result of bias, passion and prejudice. This Court may not reverse the decision of the lower court absent an abuse of discretion. The applicable standard of review requires this Court to affirm the decision below. Accordingly, I dissent.

**LEE, C.J., JOINS THIS OPINION.**


1. The absence of a motion for a mistrial by the plaintiff was partially due to the trial judge's demand that the parties drop the issue regarding the admissibility of the alleged incident involving racial slurs and consider it at a later time outside the presence of the jury. O'Connor was simply not given the opportunity to move for a mistrial immediately following his contemporaneous objection.