497 So.2d 424 (1986)
William "Pete" SIMPSON
v.
STATE of Mississippi.
No. 56509.
Supreme Court of Mississippi.
October 29, 1986.
*425 Barry J. Walker, Roy O. Parker, Tupelo, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Jack B. Lacy, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and DAN M. LEE and PRATHER, JJ.
DAN M. LEE, Justice, for the Court:
William "Pete" Simpson was indicted in Monroe County on June 18, 1982, for the March 4, 1982 murder of Sims Oliver Blanchard. After four continuances, his trial finally took place on June 21, 1984. He was found guilty of murder and sentenced to life imprisonment. He appeals this conviction, and assigns the following as error:
I. THE TRIAL COURT ERRED IN NOT SUSTAINING DEFENDANT'S OBJECTION TO ASSISTANT DISTRICT ATTORNEY BOWEN'S CLOSING ARGUMENT CONCERNING DEFENDANT'S MARRYING THE EYEWITNESS.
II. THE CROSS-EXAMINATION OF DEFENDANT'S CHARACTER WITNESSES PATTERSON AND MEDLOCK WAS SO HIGHLY PREJUDICIAL TO DEFENDANT THAT HE WAS DEPRIVED OF A FAIR TRIAL REQUIRING REVERSAL OF THIS CAUSE.
III. THE TRIAL COURT ERRED IN REFUSING DEFENDANT'S REQUESTED INSTRUCTION NO. D-11.
IV. THE TRIAL COURT ERRED IN NOT GRANTING THE MOTION FOR MISTRIAL AFTER THE ASSISTANT DISTRICT ATTORNEY'S THIRD REFERENCE TO A STATEMENT SIGNED BY THE WITNESS, ANNETTE JAMES.
V. THE TRIAL COURT ERRED IN NOT SUSTAINING DEFENDANT'S OBJECTION DURING CLOSING ARGUMENT TO THE ASSISTANT DISTRICT ATTORNEY CALLING THE DEFENDANT A LIAR.
VI. THE TRIAL COURT ERRED IN ADMITTING THE STATEMENT OF *426 WILLIAM SIMPSON INTO EVIDENCE.
VII. THE TRIAL COURT ERRED IN NOT PEREMPTORILY INSTRUCTING THE JURY TO FIND THE DEFENDANT NOT GUILTY.
VIII. THE TRIAL COURT ERRED IN INTRODUCING INTO EVIDENCE THE PICTURES OF THE DECEASED OVER OBJECTION OF DEFENDANT.
Because we find error in the prosecutor's comments on Simpson's marriage to Katie James, the eyewitness, we reverse.
On March 4, 1982, Pete Simpson shot Sims Blanchard to death. The shooting took place at the home of Katie James, with whom Simpson had lived, off and on, for several years. Katie James did not testify at trial, as she and Simpson married shortly after the shooting. Her daughter, Annette, did testify, although there were many apparent lapses in her testimony due to lack of memory about the events. Since her testimony essentially did not contradict Simpson's, his recounting of the events of that night are set out below.
At the time of the shooting, Simpson was the owner of a restaurant and lounge in Monroe County, called the "Palace." Blanchard had been an employee of Simpson's until about three or four weeks before he was killed. However, problems had developed between Simpson and Blanchard, primarily due to Blanchard's interest in Katie. Simpson fired Blanchard. Two witnesses testified for Simpson that Blanchard threatened to kill him at about that time.
On the evening of March 4, Simpson was at the Palace. At about 10:30, he took some money out of the lounge to make change from a lockbox that he kept in the trunk of his car. He opened the trunk, dropped his keys inside, took some money from the lockbox, and took a gun he was holding on a loan out of the trunk. Simpson testified that he took the gun out of the trunk for protection, since he had his back turned to anyone who was in the parking lot. He then closed the trunk and went back inside the club. After the exchange was complete, Simpson realized that he had locked his keys in the trunk of his car. He asked a couple of his patrons to take him to his (Katie's) apartment, to get his extra set of keys so he could lock up the club.
Simpson testified that he got inside his apartment without his keys, although he was not certain whether Katie unlocked the door for him or not. He went through the apartment to the back bedroom, which was his and Katie's room, and found his three natural children and his stepdaughter, Annette, watching television. They did not have his extra keys, so he went back to the front of the apartment, where he found Katie, his keys, and a man's coat and hat.
Simpson and Katie began arguing about whose clothing he had found. Simpson, gun in hand, began looking through the apartment for the interloper. He found him in the children's bedroom, in one of the bunkbeds. There is some question in the testimony about the extent to which Blanchard was clothed. According to Simpson, he saw Blanchard reach under the pillow of the bed, and, thinking he was after a gun, Simpson shot him. Simpson then went immediately to the kitchen, in the front of the house, and called the police. Simpson testified that he waited in the kitchen for the police, because, if he tried to leave the apartment, Blanchard could shoot him through the bedroom window. As he waited in the kitchen, he saw Blanchard come out of the bedroom with a gun. Simpson shot him again.
Earl White, of the Aberdeen Police Force, testified that they received a call at 11:54 p.m. from Simpson, who told them "I shot a son of a bitch. He was in the bed with my wife." The police immediately went to the apartment, where they found Simpson, Katie James, whose head was bleeding, and the body of Sims Blanchard. The police testified, and pictures taken at the scene reflect, that Blanchard was fully clothed, even to his shoes and socks. The body was lying in one of the bedrooms, alongside a bunk bed. The police did not recover a weapon from the bedroom, nor *427 did they recover any shells from Simpson's automatic weapon.
Blanchard died as the result of being shot through the heart. He had also been shot in the thigh, but the pathologist testified that the wound to the heart killed him. Both wounds were inflicted from the front. According to the pathologist, Blanchard would have lost consciousness within one to two minutes after the infliction of the chest wound, and died within three to four minutes.
Leon Williams, Chief of Police of Aberdeen, and Sheriff Frank Pat Patterson took Simpson into custody. Their records reflected that Simpson was given his Miranda warnings, and waived his rights, at about 1:30 a.m. According to Simpson, he requested an attorney before making a statement; however, the police told him that no attorney was available at that hour. Simpson gave a statement to the police, which differed somewhat from his testimony at trial. In the statement, Simpson said that, after leaving the master bedroom, where the children were watching television, he went into his boys' room. There he found his wife putting on a red robe. She pushed him out the door, and, when asked, said no one was with her. He looked in the bunk bed and saw Blanchard, who was wearing only a white T-shirt, but no pants. He shot Blanchard twice while he was still in the bed, then went to the kitchen and called the police. This statement was admitted over the defendant's objection.
The jury, after being instructed as to both murder and manslaughter, returned a verdict of guilty of murder. Simpson was sentenced to life imprisonment.

I. DID THE PROSECUTOR IMPROPERLY COMMENT UPON THE MARRIAGE OF SIMPSON TO KATIE JAMES?
During closing argument, the Assistant District Attorney made the following comment upon Simpson's claim of self defense:
First of all, it wasn't his house. It was where Katie James lived. Pete lived with Katie, on and off. In the second place, she wasn't his wife. He didn't have the decency to marry her when he did. The only reason he married Katie James was because he wanted to marry the only eye witness to the murder that he committed. You remember he married her after this happened.
The defendant's objection was overruled, and the prosecutor continued:
By his own testimony, he lived with her several years before he married her. Then he is charged with murder and he knows she is an eye-witness, and what did he do? He married her.
The State argues, in its brief, that this comment was made in order to counter the impression made at trial that Simpson shot Blanchard because he was in bed with his wife, when, in fact, Simpson and Katie were not married until after the shooting. However, at trial, Simpson specifically testified that "I didn't shoot him because he was in bed with my wife. I shot Blanchard because he was fixing to shoot me." His sole defense at trial was not provocation or passion, but self-defense.
This Court has long held that the prosecutor cannot call the defendant's wife to the stand to testify, thereby forcing the defendant to assert, before the jury, his right to have her testimony excluded. Outlaw v. State, 208 Miss. 13, 43 So.2d 661 (1949). Nor is the state entitled to an instruction regarding the defendant's failure to call his wife to the stand. Johnson v. State, 63 Miss. 313 (1885).
The appellant characterizes the prosecutor's comments as a comment upon his wife's failure to testify. This Court has held that such a comment is improper. In Cole v. State, 75 Miss. 143, 21 So. 706 (1897), such a comment mandated reversal of the conviction, even though the defendant did not object to the prosecutor's remarks, the Court there holding that the comments denied the defendant "a fair and impartial trial." 75 Miss. at 144, 21 So. at 707. In Johnson v. State, 94 Miss. 91, 47 *428 So. 897 (1909), the prosecutor's closing argument contained the following language:
Gentlemen of the jury, there is another witness to this difficulty. Where is she? Where is the wife he says he loved so dearly? Where is the wife he called his baby? If the defendant had wanted a fair hearing of this case, if he had been willing that the circumstances of the fight be fairly investigated why did he not put her on the stand?
94 Miss. at 92, 47 So. at 897.
The Court, citing Cole, reversed the conviction. Finally, in Fannie v. State, 101 Miss. 378, 58 So. 2 (1912), the prosecutor, in his closing argument:
[C]alled the attention of the jury to the fact that appellant's wife had not testified, reminded them of the fact that the state could not introduce her as a witness, but that appellant could, and suggested to them, that his failure to do so could be accounted for only on the ground that her evidence would show that he was guilty of murder.
101 Miss. at 381, 50 So. at 3.
The Court there also reversed, referring to the following language from Johnson v. State:
The statute does not contemplate or countenance such result as that husband and wife shall, directly or indirectly, be coerced by others into the witness box. The sanctities of the marital relation cannot be exposed to public scrutiny, in a case like the one before us, without the consent of the husband and wife. If, for any reason, they decline to testify for each other, their decision is final and their motives should not be questioned.
63 Miss. at 316.
Convictions have been affirmed, in spite of the jury's being aware that the defendant's wife did not testify, where the error was not deemed prejudicial. In Carter v. State, 99 Miss. 435, 54 So. 734 (1911), the prosecutor asked the defendant if his wife would testify, and whether he would object. His attorney objected to the questions, and the objection was sustained. In Bell v. State, 244 Miss. 867, 147 So.2d 624 (1962), the prosecutor called the defendant's wife to the stand, not knowing of their marital status. The Court affirmed, but noted that "The situation is different where the conduct of the prosecutor is in a taunting and reproachful manner, which can be construed as a criticism of the defendant for failure to put his wife on the stand or to let her testify." 244 Miss. at 870, 147 So.2d at 625. Finally, in Wideman v. State, 339 So.2d 1378 (Miss. 1976), the Court noted that it is normally error for a prosecutor to comment upon a wife's failure to testify. However, because the defendant subsequently called his wife to the stand and questioned her himself, the error was held to be harmless. At issue here is whether the prosecutor's statement amounted to a comment on Katie James' failure to testify. He stated that "The only reason he [Simpson] married Katie James was because he wanted to marry the only eye-witness to the murder that he committed." While the prosecutor did not flatly state that Katie's testimony would be unfavorable to Simpson, he came impermissibly close to the argument complained of in Johnson. Furthermore, considering that Simpson's only defense  self-defense  depended entirely upon the jury's accepting his version of what happened at the apartment, Katie's testimony, as the only other eyewitness, was crucial. Most jurors are aware of spousal immunity, and it is likely that they drew the inference from the prosecutor's remarks that Simpson married Katie because her testimony would be damaging. Thus, the remarks constituted an impermissible comment upon Simpson's failure to call his wife to testify, and refusal to sustain the objection to them was error.

II. DID THE PROSECUTOR IMPERMISSIBLY PREJUDICE SIMPSON BY HIS CROSS-EXAMINATION OF SIMPSON'S CHARACTER WITNESSES?
After two of the defendant's character witnesses testified, the prosecutor cross-examined them as to whether their opinions of Simpson would be the same if *429 they knew he had shot a man in the leg. The appellant's brief characterizes this questioning as involving "a fact not in evidence and one denied by the Defendant... ." However, the record shows that, during cross-examination, Simpson admitted that "I did shoot a man in the leg." He later went on to state that "I was never convicted of that that I know of." During cross-examination of Simpson's witness, Bob Patterson, the prosecutor asked "Mr. Patterson, you are aware that the Defendant had shot a man in the leg in 1978?" During cross-examination of Trent Medlock, another character witness, the prosecutor asked "Had you heard in 1978 Pete Simpson had also shot another man?"
In White v. State, 290 So.2d 616 (Miss. 1974), this Court held that "under appropriate circumstances, character witnesses may be cross-examined to test their good faith and credibility by asking about reports or rumors of particular acts imputed to the defendant... ." Id. at 618. A detailed discussion of this point appears in the case of Magee v. State, 198 Miss. 642, 22 So.2d 245 (1945), in which the Court held that "Where the defendant introduces witnesses to prove his character as to the trait charged agains [sic] him in the indictment ... the state may, on cross-examination of such witnesses, ask them if they had heard charges of that kind against him before." 198 Miss. at 647, 22 So.2d at 247. See also Rule 405(b), Miss.R.Evid., "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." There is no merit to this assignment.

III. WAS SIMPSON ENTITLED TO AN INSTRUCTION FURTHER DEFINING THE TERM "REASONABLE DOUBT?"
The trial court refused the defendant's proffered instruction D-11:
The Court instructs the jury that the doctrine of reasonable doubt is an essential substantial part of the law of the land, and that it is binding upon the jury in this case; and under law, it is the duty of the jury to consider all of the testimony in the case fairly and impartially in reaching their verdict; and if after such fair and impartial consideration of the testimony in the case, the minds of the jury are left in a state of uncertainty as to the guilt of the defendant, and there arises out of the evidence or from the want of evidence, a reasonable doubt of the existence of a single material fact upon which the guilt of the defendant depends, then it is the law, that it is the duty of the jury in such case, to give the defendant the benefit of that doubt and to find him `not guilty' as charged in the indictment.
The appellant, in his brief, asserts that the term "reasonable doubt" was used in the instructions given as only "a passing unimportant term."
The record shows that the term "reasonable doubt" was used in the following instructions which were given to the jury: C-2, on the burden of proof, C-3, on proof of every material element of the crime, S-1, on the elements of murder, S-2, on the difference between murder and manslaughter, and D-28, on self-defense. When Instruction D-11 was proffered by the defendant, the following exchange took place:
BY MR. BOWEN [Prosecutor]: Object to it, your Honor. It's an attempt to define reasonable doubt.
BY JUDGE WICKER: I am going to refuse it on the ground of repetition. I think the Court's instruction is sufficient to advise the jury about doubt. Refused as being repetitious.
In the above-referenced instructions, the term "reasonable doubt" appeared, but was never qualified to the extent of D-11. The State's position is that the language in D-11 goes too far beyond mere mention of the phrase "reasonable doubt" and, instead, impermissibly defines the term. Gray v. State, 351 So.2d 1342, 1348 (Miss. 1977); Pittman v. State, 350 So.2d 67, 71 (Miss. 1977). However Instruction D-11 is substantially the same as the following instruction, sanctioned in Wilcher v. State, 455 So.2d 727 (Miss. 1984):

*430 The Court instructs the Jury that under the law, the terms `reasonable doubt' as used by the Court in instructions to juries as the law in the trial of cases, is a sacred and substantial right of this Defendant, Bobby Glen Wilcher, charged with this crime, given and guaranteed unto him by the law of the land, and that such reasonable doubt may arise from the testimony, or the lack of testimony, and that under the law, it is the sworn duty of the jury, and each member thereof, that is [sic] there is a reasonable doubt in the mind of any member of this jury as to the guilt of the Defendant, it is your sworn duty to return a verdict of `Not Guilty.' [Emphasis theirs]
Id. at 734-35.
The difference in the two instructions which the State complains of is the language in D-11, "if after such fair and impartial consideration of the testimony in the case, the minds of the jury are left in a state of uncertainty as to the guilt of the defendant... . ." The State asserts that this language amounts to a definition of reasonable doubt. The language of Pittman which the Court held constituted a definition of reasonable doubt told the jurors "beyond a reasonable doubt did not mean beyond all possible doubt but meant a doubt based on reason and common sense." 350 So.2d at 71. In Pittman, the instruction attempted to qualify the term "doubt" by telling the jurors what was reasonable. In this case, the defendant merely sought to tell the jurors that if they were in "a state of uncertainty" after the presentation of the evidence, that uncertainty constituted reasonable doubt. There is an inherent difference between the two instructions. However, we find that the jury was adequately instructed on reasonable doubt, and the refusal to give D-11 was not reversible error.

IV. WAS THE STATE'S ATTEMPT TO IMPEACH ITS OWN WITNESS, ANNETTE JAMES, BY THE USE OF A PRIOR STATEMENT, SO PREJUDICIAL AS TO REQUIRE A MISTRIAL?
Annette James had apparently given a statement to the police shortly after the incident which detailed the shooting of Sims Blanchard. At Simpson's trial (which occurred over two years after the incident) Ms. James was beset by a rather severe loss of memory. She testified generally to the events of the evening, including Blanchard's visit to the apartment, and Simpson's subsequent arrival and search for his keys, but then the following exchange took place:
Q. What did you hear your mother say?
A. What did I hear her say?
Q. Yes, to Pete?
A. I don't know.
Q. You don't know or you don't remember?
A. I don't remember.
Q. What did you hear Pete Simpson say to your mother?
A. I told you it was some arguing, but I don't remember what was said.
At that point, the prosecutor approached the witness and asked to "show you something and let you read it and see if it will refresh your memory." The jury was excused and counsel for the defendant objected to the State's attempt at impeachment. The prosecutor responded "That is the only thing I am trying to do, refresh her recollection on this point by the use of a statement which she gave to law enforcement officers shortly after it happened." The court allowed the witness to read the statement, then she was questioned about it.
Q. All right, you remember more details after reading this statement than you did before?
A. Not really.
Q. No, I'm asking you, after you read this statement can you better tell us about what happened that night?
A. No.
The jury was then returned to the courtroom. The prosecutor resumed his questioning about the shooting, asking Ms. James about Simpson's search for Blanchard, after he discovered his hat and coat in *431 the living room. James admitted that he came back to her room looking for Blanchard, then there was the following exchange:
Q. What did he say about Sims Blanchard when he came into that room?
A. I don't know what he said.
Q. May I approach the witness again, your Honor?
BY JUDGE WICKER: Yes, you may.
Q. Miss James, let me ask you to read the last part of this 
Counsel for the defendant immediately objected, and the objection was sustained. Finally, at the end of James' direct examination, the prosecutor asked:
Q. Miss James, a day or so after this happened, do you remember talking to a policeman about what happened that night?
A. I know it was afterward, I don't know how many days. I don't know whether it was a day or two or what.
Q. All right, you do remember talking to him. Did you tell him what happened?
A. Yes, I was telling him what I knew.
Q. Did you sign a statement as to what happened?
At that point, counsel for the defendant objected, which was sustained, and moved for a mistrial, which was overruled. It is the court's refusal to grant a mistrial which is assigned as error.
The State contends that the prosecutor was not attempting to impeach its own witness, but was merely laying a predicate for introduction of the statement. It further contends that the court erred in not allowing the witness to see the statement. However, the record indicates that Ms. James did see the statement, and testified that it would not help her recall the events of that night. Thus, the State failed in establishing an essential criteria necessary for introduction of a prior recorded statement: that, having read or referred to it, the witness's recollection is refreshed. Furthermore, the State did not lay the proper predicate for impeaching its witness. Knowing that Annette James was still living with her mother and Simpson, and that her mother had subsequently married Simpson, the State could reasonably expect her to be hostile on the stand, and, thus, cannot claim surprise.
In any event, the issue here is whether the questioning of Ms. James entitled Simpson to a mistrial. The record shows that, after the third reference to the prior statement, the defendant objected, which objection was sustained, and immediately moved for a mistrial. In Gardner v. State, 455 So.2d 796 (Miss. 1984), we refused to find error in such a situation, holding:
Since the trial judge sustained the first objection, no prejudice resulted to the appellant from the question. This court has held that where an objection to a question is sustained and no request is made that the jury be instructed to disregard the question, there is no error.
Id. at 800.

V. SHOULD THE TRIAL JUDGE HAVE SUSTAINED THE DEFENDANT'S OBJECTION TO THE PROSECUTOR'S CALLING HIM A "LIAR" DURING CLOSING ARGUMENT?
The statements complained of are these:
"I think this case is a classic example of how, when given enough time, a criminal defendant, especially a murderer, can ... lie... .
"[D]o you believe this man right here that he would lie about it to save his neck?"
"He said, `He was in bed with my wife. He didn't have any clothes on, except a t-shirt.' A blatant lie."
"I am going to tell you that the ends of justice by a not guilty verdict would not be served at all, if this man were allowed to fabricate, twist, distort, lie-"
Only the last statement was objected to at trial. The court overruled the objection, noting the wide latitude allowed during argument.
The cases cited by the appellant deal with references made to issues not properly before the jury, such as the defendant's *432 race, or his character, especially where he did not testify. In this case, the comment by the prosecutor was that the defendant was not telling the truth about the events of March 4, 1982. That can hardly be said to be an extraneous issue, since, if the State believed Simpson's story, he would not have been tried. There is no error here.

VI. DID THE TRIAL COURT ERR IN ADMITTING SIMPSON'S STATEMENT INTO EVIDENCE BECAUSE IT WAS MADE AT 1:30 A.M.?
The appellant cites no authority for this proposition. Simpson does not contend that the statement was made involuntarily; rather, he relies on his testimony that he was told an attorney would not be available at that late hour, and asserts that statements taken at that hour of night are per se inadmissible. He does not argue that he was particularly prejudiced by the questioning, but that, as a matter of law, this Court should hold that statements cannot be taken at that hour of day because of "the time, the condition of Appellant, the condition of the officers because of the lateness of hour, the lack of sleep of all parties, the possibility of misunderstanding, mistake, indifference... ." [Appellant's Rebuttal Brief, page 5]
The reasons for denying this assignment of error are two-fold: first, the appellant has cited no authority for his argument. Ramseur v. State, 368 So.2d 842 (Miss. 1979); Dozier v. State, 247 Miss. 850, 157 So.2d 798 (1963); second, to reverse on this basis would be to impose a court-made rule on police procedures without a showing of prejudice to this appellant. There may, in some cases, be perfectly valid reasons for taking a statement in the early hours of the morning, and we do not believe that the ability to do so should be flatly prohibited.

VII. SHOULD THE TRIAL COURT HAVE GIVEN A PEREMPTORY INSTRUCTION ON THE BASIS OF THE WEATHERSBY RULE?
The appellant argues that he was entitled to a peremptory instruction because there was nothing in the record to contradict his story that he shot Blanchard in self-defense. However, his story at trial that he shot Blanchard in self-defense differs materially from his statement to the police that he shot Blanchard twice while he was still in the bed.
That a defendant's voluntary statement made to law enforcement officers shortly after the incident may conflict in substantial particulars with his or her testimony at trial may be a significant factor in taking a case out of the Weathersby [v. State, 165 Miss. 207, 147 So. 481 (1933)] rule.
May v. State, 460 So.2d 778, 782 (Miss. 1984).
We hold here that Simpson's statement to the police contradicts in material particulars his testimony at trial, and, thus, he was not entitled to a peremptory instruction.

VIII. DID THE TRIAL COURT ERR IN ADMITTING PHOTOGRAPHS OF BLANCHARD?
Three photographs of Blanchard's body were admitted into evidence at trial. They were marked as State's Exhibits #2, #3, and #4. Exhibit No. 2 is almost a full-length picture of Blanchard, showing him fully clothed, with a sock and shoe on his left foot. Exhibit No. 3 shows a sock and a shoe on his left foot, and more clearly shows that Blanchard fell next to a bed. Exhibit No. 3 is more of a close-up shot, showing Blanchard's head and trunk. In all of the shots, Blanchard's body is lying on his stomach and neither his wounds nor any blood is visible. The pictures are black and white.
The appellant argues that the pictures had no probative value and were admitted only to inflame the jury. He relies on the testimony at trial of former Chief of Police Leon Williams, who took the pictures. Williams testified that he took the pictures only "to get a picture of the body." *433 "That's all I figured I needed, a picture of the deceased."
As recently as in Stringer v. State, 500 So.2d 928 (1986), this Court said, "It has long been the position of this Court that photographs of bodies may be admitted into evidence where they have probative value, and where they are not so gruesome as to be overly prejudicial and inflammatory. Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985); Cabello v. State, 471 So.2d 332 (Miss. 1985)." At page 341. [Emphasis added]
The appellant, by his emphasis on Williams' testimony, seems to argue that probative value must be established at the time the pictures are made. However, in Cabello, this Court reiterated its view that "the admission of photographs is within the discretion of the trial court." 471 So.2d at 341. Thus, Williams' motivation for taking the pictures is irrelevant, as long as the trial court properly found that the pictures have probative value.
It cannot be seriously argued that the photographs in question are "so gruesome as to be overly prejudicial and inflammatory." However, it is dubious whether they all had probative value. At issue in this case was whether Blanchard was shot while in the bed or while standing in the doorway of the bedroom, whether he was fully clothed when he was shot, and whether Blanchard's gun could be seen in the photographs. Exhibits No. 2 and 3 were adequate to show the whereabouts of the body and the clothing on it. Exhibit No. 4 appears to be cumulative.
At issue, then, is whether cumulative or repetitive photographs of a deceased may be admitted into evidence where they are not particularly gruesome. The language quoted above from Stringer would indicate that photographs must not be inflammatory and they must have probative value. However, in light of the fact that these pictures were not particularly gory, any error in admitting them was harmless.
In conclusion, we hold that the argument of the district attorney as to appellant's wife's failure to testify should not have been permitted and the failure of the trial judge to sustain an objection thereto was reversible error. Therefore, we reverse this case, vacate the life sentence and remand it back to the Circuit Court of Monroe County, Mississippi for such further action as may be appropriate not inconsistant with this opinion.
REVERSED AND REMANDED.
WALKER, C.J., ROY NOBLE LEE AND HAWKINS, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.