759 So.2d 434 (2000)
Curtis BRADFORD, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01699-COA.
Court of Appeals of Mississippi.
January 25, 2000.
*435 James H. Arnold Jr., Durant, Harvey Christopher Freelon, Jackson, Attorneys for Appellant.
Office of the Attorney General by Pat S. Flynn, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., LEE, AND PAYNE, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Curtis Bradford was convicted of the felony child abuse of his girlfriend's two-year-old son. On appeal, he argues that the trial court should not have admitted evidence of the child's prior injuries, that a mistrial should have been granted following a deputy's testimony that a hole in the wall of the apartment where the child lived appeared to be the size of a baby's head, and that trial counsel was *436 ineffective. There is no merit to these arguments and we affirm.

FACTS
¶ 2. Curtis Bradford lived with his mother in an apartment downstairs from that of Cynthia Clay. In the last two months of 1997, Bradford began seeing Ms. Clay, spending more and more time in her apartment with her and her four children, Demetrius, age two; Michelle, age six; Caneshia, age seven; and Jonathan, age nine. Eventually, he moved into the Clay apartment.
¶ 3. On January 9, 1998, Ms. Clay noticed some bruises on Demetrius's body and thought that he did not feel well. She asked her aunt, who sometimes kept the child, to take him to the doctor. The aunt took him to Dr. Albert Bartee in Lexington, who found that the child had a fracture of the left arm and a partially-healed fractured left clavicle. He also had scratch marks on his face and scratches or burn marks on his left scrotum. Demetrius was admitted to Methodist Hospital in Lexington, where he remained until January 16. During the child's hospital stay, his injuries were investigated by Katherine Foster of the Holmes County Department of Human Services as possible child abuse.
¶ 4. After the investigation concluded that Demetrius had been physically abused, the youth court ordered him removed from his mother's care. He was sent home with his maternal grandmother, Hattie Clay. Without the court's knowledge, Mrs. Clay returned Demetrius to Cynthia Clay on January 19, 1998.
¶ 5. On January 21, Ms. Clay left Demetrius alone with Bradford for thirty to forty-five minutes while she went to the Department of Human Services to get a signature on an excuse allowing her to go back to work. When she returned, Demetrius was in bed, and there was a hole in the wall of the apartment's hallway. Later, when Ms. Clay checked on her son, she saw that his position in the bed was odd, that he had scratches on his head and that he was acting listless. After taking him to the bathroom and undressing him, she found numerous bruises on his body. When asked what happened, Bradford told Ms. Clay that Demetrius had fallen. That evening, the child would not eat and began throwing up, with his eyes rolling back in his head. Ms. Clay asked a neighbor to take her and Demetrius to the hospital, over Bradford's objections. After doctors in Greenwood examined Demetrius, they transferred him by ambulance to University Hospital in Jackson. There, Dr. Andrew Parent found that Demetrius had sustained a skull fracture with sub-dural hematoma, three rib fractures, a liver laceration, right renal and adrenal hematomas, retinal hemorrhages in both eyes and numerous bruises, in addition to the spiral fracture of his left arm and the left clavicle fracture discovered January 9.
¶ 6. When Ms. Foster was notified that Demetrius had been beaten, she called her supervisor, Sammie Stuart, who went to University Hospital to check on the child, who was then in intensive care. Before filing her report, Ms. Stuart interviewed Demetrius's siblings, who stated that Curtis had repeatedly hit Demetrius on other occasions. Holmes County Deputy Roosevelt March also investigated the incident, photographing Demetrius in the hospital and visiting Ms. Clay's apartment, where he took pictures of the hole in the wall. Following this investigation, Bradford was indicted for felony child abuse in the January 21 incident. After a jury trial in Holmes County Circuit Court, Bradford was found guilty of felony child abuse.

DISCUSSION

I. Admissibility of Evidence of the January 9 Incident
¶ 7. On appeal, Bradford argues that evidence of the January 9 incident, for which he was not indicted, should not have been admitted. He argues that it prejudiced the jury by tending to show that he *437 was guilty of abusing Demetrius on other occasions.
¶ 8. Evidence of other bad acts may be admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" under certain conditions. M.R.E. 404(b). A case relied upon by Bradford permitted evidence of a prior shooting to be admitted as bearing on the question of whether or not the shooting in which the victim was killed was accidental. Readus v. State, 272 So.2d 659, 661 (Miss.1973):
It is not to be inferred from the rule stated above that the admission of evidence which shows or tends to show the commission of an offense other than the particular one with which the accused is charged must be excluded in all cases and under all circumstances. There are, on the contrary, several well recognized exceptions to and limitations upon the general rule stated. Evidence of other crimes is always admissible when such evidence tends directly to establish the particular crime, and it is usually competent to prove the motive, the intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or the identity of the persons charged with the commission of the crime on trial.
Id., quoting Hawkins v. State, 224 Miss. 309, 80 So.2d 1 (1955).
¶ 9. Initially, the trial court in the present case sustained the defense's objection to evidence of the January 9 injuries and admonished the jury to disregard such testimony. Later, however, the court decided to admit the testimony and gave the jury a limiting instruction at the close of all testimony. That instruction cautioned the jury that they could not consider the January 9 evidence as "touching upon the guilt or the innocence of the Defendant concerning the charge for which he is presently on trial for injuries to the child Demetrius Clay on or about January 21, 1998. You may give this evidence such weight and credit as you deem proper, relating to motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
¶ 10. Bradford complains that a prejudicially long period of time elapsed between the mention of the January 9 incident in the State's opening remarks and the court's admonishment of the jury to disregard the reference. That is inconsequential since ultimately the jury could consider it for the limited purposes covered by instructions given by the court.
¶ 11. The testimony concerning the January 9 incident was properly admitted as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." M.R.E. 404(b). The supreme court has permitted testimony of prior child abuse to show a continuous and purposeful course of criminal abuse and to negate testimony that the injuries to the child in the charged incident were the result of a fall. Shelton v. State, 445 So.2d 844, 848 (Miss.1984). The State presented nearly a dozen instances of alleged child abuse. The court stated that the "relevance of the evidence is obvious where, as here, it was needed to negate the testimony of appellant's wife that the injuries were the result of a fall or other isolated accident." Id.
¶ 12. Bradford's story was that Demetrius' injuries resulted from a fall. The evidence of the January 9 injuries, although not part of the facts upon which the indictment was based, tended to negate this story. In addition, the January 9 facts supplied the jury with the overall picture or setting in which the January 21 events occurred, so as not to confuse them. Underwood v. State, 708 So.2d 18, 32 (Miss. 1998) ("Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury.")
¶ 13. We find the evidence of this earlier incident to be probative and admissible.

*438 II. "Hole-In-The-Wall" Testimony

¶ 14. Deputy Roosevelt March was called to University Hospital to investigate Demetrius' injuries. He took pictures of the child's bruises and that same night photographed the interior of Ms. Clay's apartment. One of the photographs admitted through his testimony on direct examination showed a large hole in the wall of the hallway in the apartment.
Q. (Prosecutor) Chief, where was that photograph taken?
A. Taken in the apartment, Ms. Cynthia Clay's apartment.
Q. Who took that photograph?
A. I did.
Q. When did you take it?
A. On the same day, on the 22nd.
Q. And what does it depict?
A. It seemed ... that it was a small body of a baby's head.
MR. ARNOLD (defense counsel): Objection, Your Honor.
THE COURT: Sustained.
MR. ARNOLD: Move for a mistrial.
THE COURT: Overruled.
Q. (Mr. Holmes) There's awhat is there in the wall?
A. Indent of a small, seemed like to me a small baby's head.
MR. ARNOLD: Same thing! He's done it again! We object!
THE COURT: Sustained. Mr. Roosevelt, I don't think you have the ability to do that, if you'd get back into that line of questioning.
Q. (Mr. Holmes) You took this picture?
A. Yes, sir, I did.
Q. At the scene?
A. That's correct.
Q. Did you later, along with Chief Ford, interview the defendant, Curtis Bradford?
A. That's correct.
Q. And did he indicate to you that he made that mark in some way?
A. That's correct. He said the floor was wet and he slipped and his elbow hit up that far.
Q. You saw the indentation. You took the photograph. Did it appear to you to be an elbow indentation?
MR. ARNOLD: Object to hearsay, Your Honor. No waycausing this witness to speculate. No way he could possibly say what caused this.
THE COURT: Response?
MR. HOLMES: He could say what it looked like to him, Your Honor. I think a layman can tell the difference between an indentation of an elbow and a small head.
MR. ARNOLD: Objection, Your Honor. The district attorney is getting into it now.
THE COURT: I'll sustain the objection. If you want to ask him that question, you need to lay the proper foundation for it.
MR. ARNOLD: If it please the Court, I would also move for a mistrial based upon what the DA said.
THE COURT: Overruled.
¶ 15. Bradford alleges that the trial court should have declared a mistrial. As support for this position, he gives us this quote:
Elementary to all trial proceedings is the proposition that the occurrence of any prejudicially incompetent matter or misconduct before a jury, the damaging effect of which cannot be removed by admonition or instructions, necessitates a mistrial. However, it is the well established rule in Mississippi that where a trial judge sustains an objection to testimony interposed by the defense in a criminal case and instructs the jury to disregard it, the remedial acts of the court are usually deemed sufficient to remove any prejudicial effect from the minds of the jurors. The jury is presumed to have followed the directions of the trial judge.
*439 Walker v. State, 671 So.2d 581, 621 (Miss. 1995). Though Walker provides that generally the trial court's decision will be affirmed that an admonishment is enough, Bradford relies on the fact that no admonishment was given, which Bradford concludes requires reversal now. However, Bradford never requested an admonishment. Instead, he called for a mistrial without taking the intermediate step of asking for an admonishment which, Bradford himself argues, presumably would have been heeded.
¶ 16. In one precedent the defense argued that a witness had been improperly questioned in order to imply that Cotton was involved in other illegal activities. Cotton v. State, 675 So.2d 308, 314 (Miss. 1996). Although the supreme court acknowledged that there was no probative value in this line of questioning, it affirmed because the trial court "properly responded to and sustained the defense's objection to these questions. Because the defense failed to request that the jury be admonished, the sustaining of the objection was sufficient to prevent reversible error." Id. at 315.
¶ 17. Moreover, an appellate court "will not reverse the trial court based upon something that it was not asked to do." Weatherspoon v. State, 732 So.2d 158, 164 (Miss.1999). Once "an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." Simpson v. State, 497 So.2d 424, 431 (Miss. 1986). Bradford's objections were sustained three times. Absent a request to admonish, there is nothing further to review.

III. Ineffective Assistance of Counsel
¶ 18. Bradford argues that his trial attorney was ineffective and that his mistakes prejudiced the case. Our appellate function is to determine whether counsel's performance was deficient and whether the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court elaborated on these requirements in this way:
A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance: that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
Strickland, 466 U.S. at 689, 104 S.Ct. 2052, quoted in Stringer v. State, 454 So.2d 468, 477 (Miss.1984).
¶ 19. Bradford disagreed with his courtappointed defense attorney about trial strategy, including his counsel's motion in limine to exclude evidence of the January 9 abuse. Bradford argued that allowing evidence of the January 9 abuse would tend to show his innocence because the other injuries were when he believed he had an alibi. Further, his counsel learned of some character witnesses that Bradford's mother wanted called on the Saturday before the Monday morning of trial. He issued subpoenas for them the morning of trial and was unable to interview them before trial. On the morning of trial, Bradford asked to be allowed to fire his court-appointed attorney and hire private counsel, which the court denied.
¶ 20. We do not find the Mississippi Rules of Professional Conduct to control on whether Bradford's counsel was effective. The Rules themselves state that violations do not "create any presumption that a legal duty has been breached." Miss. R. Prof. Conduct "Scope." However, the ethical obligations are a somewhat *440 detailed statement of guidance and address the specific issue involved here:
A lawyer shall abide by a client's decisions concerning the objectives of representation,... and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, a lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
Miss. R. Prof. Conduct 1.2(a).
¶ 21. The comment to the rule explains:
Both lawyer and client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. At the same time, a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so. A clear distinction between objectives and means sometimes cannot be drawn, and in many cases the client-lawyer relationship partakes of a joint undertaking. In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected.
Miss. R. Prof. Conduct 1.2(a) cmt (emphasis added).
¶ 22. As additional guidance, we note that the American Bar Association Defense Function Standards provide that, with a few exceptions, strategic and tactical decisions are the exclusive province of the defense counsel, after consultation with the client. Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983), citing ABA Standards for Criminal Justice 4-5.2 (2d ed.1980). In Jones, the respondent informed his court-appointed counsel of several claims he felt should be raised, but counsel rejected most of them because they would not help respondent to obtain a new trial and because they could not be raised for the first time on appeal. Id., 103 S.Ct. at 3309. The U.S. Supreme Court held, interpreting Rule 1.2(a), that "an indigent defendant has no constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Id., 103 S.Ct. at 3310.
¶ 23. Though compliance with these rules is not conclusive, we are persuaded by them that no ineffectiveness was shown. Whether to file a motion in limine to exclude evidence of the January 9 abuse may properly be characterized as trial tactics, to be decided by Bradford's attorney upon consultation with his client.
¶ 24. Without a doubt, Bradford was a difficult client for his court-appointed counsel. Not only would Bradford not accept advice on matters of which evidence to try to keep out and which to allow in, Bradford presented last-minute witnesses and asked for permission from the court to fire counsel on the first day of trial. Whether Bradford's counsel made the best decisions at every point in the trial is not a matter for hindsight by this court. "The defendant in a criminal case does not have a right to a perfect trial or to the best counsel. He is entitled to a fair trial and to effective counsel." Berry v. State, 345 So.2d 613, 615 (Miss.1977). We find no ineffectiveness.
¶ 25. Under the two-pronged test of Strickland, even if his counsel's performance could be faulted, the claim of ineffective assistance of counsel must fail without a showing of result-changing prejudice to Bradford. The evidence included medical records showing that Demetrius sustained a merciless beating, testimony of siblings who witnessed Bradford's abuse of *441 the child on numerous occasions, and the testimony of DHS caseworkers and law enforcement personnel, as well as the testimony of the children's mother. We find that flawless representation would have had little opportunity to convince a jury of Bradford's supposed innocence.
¶ 26. Bradford was presumed innocent, but the effectiveness of his counsel must be judged in light of the overwhelming nature of the evidence against him. We find no constitutionally deficient counsel as defined by Strickland.
¶ 27. THE JUDGMENT OF THE HOLMES COUNTY CIRCUIT COURT OF CONVICTION OF FELONY CHILD ABUSE AND SENTENCE TO TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE LAST THREE YEARS SUSPENDED, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO HOLMES COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, DIAZ, IRVING, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.