# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-02009-SCT

*BYRON J. SIMMONS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 8/9/2000 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT M. RYAN |
| | THOMAS M. FORTNER |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/11/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/2/2002 |


**BEFORE SMITH, P.J., DIAZ AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. Byron J. Simmons (Simmons) was indicted for the murder of Angela Wilkerson (Wilkerson). The indictment specifically charged that on or about October 12, 1998, Simmons did unlawfully and feloniously kill and murder Wilkerson with the deliberate design to effect her death, in violation of Miss. Code Ann. § 97-3-19 (1). Simmons was tried by a jury commencing on August 8, 2000, concluding on August 9, 2000. Simmons was convicted on the charge and subsequently sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections. After the trial court denied Simmons's motion for J.N.O.V. and New Trial on November 10, 2000, Simmons timely noticed his appeal to this Court on November 20, 2000.

**FACTS**

¶2. Simmons and Wilkerson were romantically linked for years and had previously lived together at one time and had contemplated marriage. However, at the time of Wilkerson's death, Simmons and Wilkerson were no longer living together.

¶3. The cause of Wilkerson's death was a gunshot wound to the left side of her head. The recovered projectile entered the left cheek of Wilkerson's face, traveled through her skull and severed her spinal cord, causing her death. John F. Dial, III (Dial), a firearms expert, identified the recovered projectile as being fired from a .38 caliber revolver type pistol.

¶4. Dr. Rodrigo Galvez (Dr. Galvez), forensic pathologist, testified that the gunpowder soot or "tatooing" on the skin indicated that the shot was fired at very close range. Dr. Galvez testified that the longest Wilkerson could have lived from the fatal shot was four to five minutes. Dr. Galvez testified that due to the severing of her spine, Wilkerson was not able to move from the neck down which caused her to collapse before she died.

¶5. Subsequent to Wilkerson's shooting, Simmons went to the City of Jackson Police Station where he was questioned. After being questioned, Simmons showed the officers to Wilkerson's apartment. Officer Ruby Johnson (Officer Johnson) testified that she spoke with Simmons on October 13, 1998, at approximately 12:30 a.m., at Court Services located in the Jackson Police Department. Officer Johnson was first informed that Simmons and his girlfriend had an altercation and that Simmons wanted to turn himself in believing he had hurt his girlfriend. When Officer Johnson met with Simmons, Simmons told her that he and his girlfriend had an argument which resulted in his accidently shooting her.

¶6. Simmons was not under arrest when he initially spoke with Officer Johnson. Simmons agreed to show Officer Johnson where he left Wilkerson. Simmons, who still was not under arrest at the time, traveled with Officer Johnson in her patrol car to Wilkerson's apartment located at 117 Bon Air, in Jackson, Mississippi. When Officer Johnson arrived at the scene of Wilkerson's apartment, Wilkerson's door was partially open. Officer Johnson, along with the other units that arrived at the scene, discovered Wilkerson's body lying in a pool of blood with a wound on her cheek. Simmons was arrested and read his *Miranda* rights.

¶7. After being Mirandized, Simmons told Officer Johnson again that he and Wilkerson had been in an argument and he shot her accidentally. After he shot Wilkerson, Simmons left Wilkerson's apartment, frantically drove around and threw the weapon off a bridge. On redirect, Officer Johnson testified that she observed the gunshot wound but no other bruises, scratches or other injuries on Wilkerson's body. Officer Johnson further testified that she observed no signs of a physical struggle in the apartment.

¶8. Jackson Crime Scene Investigator Charles Taylor (Taylor) testified as to the evidence collected and documented at Wilkerson's apartment. Taylor testified that Wilkerson was found deceased, lying face up on the floor partly in the west bedroom and partly in the hallway. Taylor also testified as to the condition of Wilkerson's apartment. He stated, "The apartment was not well-kept, although there was no sign of a fight in the apartment. There was no furniture thrown around. There was basically no sign of a fight at all." There was no sign of forced entry to the apartment. No gunshell casings were discovered in the apartment.

¶9. Taylor testified at trial that he collected a gunshot residue (GSR) kit from Simmons. Taylor explained that once collected, Simmons's GSR test was sent to the crime lab to be examined on a scanning electron microscope. The test results were mailed back to Taylor. While Taylor testified that the results came back positive, he also expressed his lack of confidence in GSR testing. Taylor testified that since you cannot tell

whether a person actually fired a gun himself or whether he was only in the same area of someone else firing a gun, he did not place confidence in the GSR testing results.

¶10. David Whitehead (Whitehead), a forensic scientist with the Mississippi Crime Lab in the microanalysis section, testified as to Simmons's gunshot residue. Whitehead, was accepted as an expert by the trial court, over Simmons's objections, to testify as to the scientific certainty of whether the recovered particles from Simmons were consistent with Simmons being the shooter.

¶11. Wilkerson's mother, Sandra Purvis (Purvis), testified at trial as to the on again, off again relationship between Wilkerson and Simmons. The trial court allowed Purvis to testify as to an altercation that occurred between Wilkerson and Simmons approximately four months prior to Wilkerson's death. According to Purvis's testimony, on July 8, 1998, Wilkerson was hospitalized as a result of an altercation with Simmons. Simmons moved out of Wilkerson's apartment following the incident. Purvis testified that to her knowledge, Wilkerson never resumed a relationship with Simmons.

¶12. The jury returned with its verdict of guilty as charged in the indictment, and the trial court sentenced Simmons to a term of life imprisonment. Aggrieved by the verdict and the sentence imposed by the court, Simmons now appeals to this Court and raises the following issues:

**I. Whether the trial court unfairly prejudiced and denied Simmons a fair trial by allowing the expert opinion regarding the testing of the gunshot residue samples?**

**II. Whether the trial court erred in allowing the introduction of evidence of Simmons's prior bad acts?**

**III. Whether the trial court erred in admitting hearsay statement from the victim's mother?**

**IV. Whether the cumulative error requires reversal?**

## DISCUSSION

## I. Unfair Prejudice

¶13. Simmons argues that the trial court committed reversible error in admitting the expert opinion testimony of Whitehead regarding the results of the gunshot residue testing. Simmons contends that he was unfairly prejudiced by Whitehead's testimony and thereby received a fundamentally unfair trial. Simmons argues that Whitehead's results were inconclusive, speculative and unfairly prejudicial to the defense.

¶14. A gunshot residue (GSR) test was performed on Simmons, and the samples were sent to the state crime lab to determine if the samples contained gunshot residue. At trial, Whitehead, an employee of the Mississippi Crime Lab, was accepted as an expert by the court. Simmons did not question Whitehead's qualifications or his ability to follow the proper testing procedures generally accepted in the scientific community. Whitehead testified regarding the results of the GSR test conducted on samples taken from Simmons. Whitehead testified that the crime lab issues three types of reports after analyzing GSR tests: a positive report which indicates that gunshot residue was positively identified, a negative report which indicates no residue was found, or a characteristic report which indicates there are particles present but they do not meet the strict definition of gunshot residue.

¶15. Whitehead's report regarding the Simmons's sample was a characteristic report. Simmons alleges that Whitehead's testimony strongly and inaccurately suggested to the jury that the test results were positive for gunshot residue when in fact not all of the characteristics of residue were found. Simmons submits that unless Whitehead could testify within a reasonable degree of scientific certainty that the test indicated gunshot residue on his hands any opinion rendered would be highly speculative and hypothetical.

¶16. The report reflects that when questioned by the State as to the GSR testing, Whitehead testified as follows:

> State: Did you find particles consistent with particles present in gunshot residue?

> Whitehead: Yes, sir, I did.

> State: And can you say that with a reasonable degree of scientific certainty that you found particles consistent with gunshot residue?

> Whitehead: Yes, sir. There were particles present that were indicative of gunshot residue, but because they did not meet the strict definition of what gunshot residue is, they were not positively identified. You can find particles that don't always -- you know, they're not always round. They don't always contain -- there could be antimony barium particles or lead antimony particles. I have no reason to believe it's anything else, but because it does not meet that strict definition of what gunshot residue is, it cannot be positively identified in our laboratory.

> State: Now, so that we can be fair to everyone involved in this, would it be fair to say that you can neither rule in nor rule out Byron Simmons as a shooter of a firearm based on these tests?

> Whitehead: I can never do that. All I can simply say is that person was either in the environment or not in the environment.

> State: And can you say that he was nor wasn't in the area where a firearm was fired in this case?

> Whitehead: No, sir.

¶17. Simmons claims that allowing Whitehead's testimony regarding the GSR test resulted in reversible error because results were inconclusive, speculative and unfairly prejudicial to the defense. In support of his argument, Simmons contends that based on *Foster v. State*, 508 So.2d 1111, 1118 (Miss. 1997), Whitehead's testimony was highly speculative and admitted in error by the trial court in violation of M.R.E. 403. Simmons submits that accepting Whitehead's conclusion that the residue found on the samples taken from Simmons could have been gunpowder residue, amounts to an abuse of the trial court's discretion. In *Foster*, this Court held that in reviewing a M.R.E. 403 balancing process the appellate court's task is not to engage anew in a 403 balancing process but simply to determine "whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence." *Foster*, 508 So.2d at 1118.

¶18. The State takes the position that the testimony was properly admitted, the results of the test were not speculative as to whether or not there were characteristics of gunshot residue and the test did not produce a negative result. Whitehead explained that while the particles could have contained the same elements of gunshot residue, the shape of the particles determines whether the findings will produce a positive or only characteristic result. If the proper shape is not found, despite the presence of gunshot residue, the test will

determine that particles characteristic of gunshot residue were identified. That is exactly the situation Whitehead discovered when the samples taken from Simmons were tested.

¶19. Whitehead testified that the test produced results characteristic of gunshot residue. The test results were not positive for gunshot residue based on the standards used by the crime lab, however, the test results were also not negative either. Whitehead further testified that the results of the test could not determine conclusively if someone fired a weapon, only that if they were in the "environment" of a discharged weapon.

¶20. The State cites *Manning v. State*, 726 So.2d 1152 (Miss. 1998), in support of its contention that the trial court did not abuse its discretion in allowing Whitehead's testimony regarding the GSR test results.

¶21. In **Manning**, the forensic expert testified that hair samples found in the car of the victim "exhibited characteristics associated with the black race." *Id*. at 1170. The expert did not testify that the hair belonged to Manning. Manning argued that the evidence was more prejudicial than probative and should not be admitted by the trial court. *Id*. at 1180. This Court stated:

> [T]he trial judge did not abuse its discretion in admitting the hair analysis evidence. It was not more prejudicial than probative. The expert did not claim that the hair matched that of the defendant. He only testified that the hair came from a member of the black race. He also admitted that his expertise could not produce absolute certainty. This did not invade the province of the jury but left it to them to decide if these were Manning's hairs or not. This assignment of error is both procedurally barred and meritless.

*Id*.

¶22. M.R.E. 403 provides for the exclusion of relevant evidence where it would produce prejudice, confusion, or waste of time. M.R.E. 403 states:

> Although relevant, evidence may be excluded if it is probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶23. In the case sub judice, Whitehead never testified that the GSR test established that Simmons had fired a weapon. In fact, Whitehead only testified that characteristic particles were identified in the sample, but he could not say positively whether or not Simmons had fired a weapon. Whitehead explained to the jury how the test was interpreted.

¶24. The trial court did not abuse its discretion in allowing the testimony from Whitehead to be admitted into evidence. This issue is without merit.

## II. Prior Bad Acts

¶25. Simmons argues that the trial court improperly allowed evidence of his prior bad acts against Wilkerson in violation of the procedures set forth in Rules 403 and 404(b) of the Mississippi Rules of Evidence.

¶26. Purvis testified as to the relationship between Wilkerson and Simmons. Wilkerson and Simmons

maintained a continuous relationship for approximately three years. During part of the relationship, Simmons and Wilkerson lived together. Purvis testified that approximately four months before Wilkerson's death, Simmons and Wilkerson had ended their relationship, and Simmons had moved out of Wilkerson's apartment. Simmons and Wilkerson had planned to be married in August of 1998.

¶27. On July 8, 1998, Wilkerson called Purvis crying. When Purvis arrived at her daughter's apartment, she found Wilkerson lying unconscious on the kitchen floor and Simmons in the bedroom. The police responded to the domestic violence call, and the paramedics transported Wilkerson to the emergency room. Simmons was not arrested. Wilkerson suffered a mild concussion.

¶28. Purvis accompanied her daughter home from the hospital. Simmons moved out of Wilkerson's apartment. Purvis testified that to her knowledge, Wilkerson and Simmons never resumed their relationship.

¶29. In the case sub judice, Simmons argues that the admission by Purvis of his prior bad acts violates M.R.E. 404(b). M.R.E. 404(b) states:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. **It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

(emphasis added).

¶30. Usually, evidence of another crime or prior bad act is not admissible. ***Ballenger v. State***, 667 So.2d 1242, 1256 (Miss. 1995). However, this Court has held that evidence or proof of a prior crime or bad act is admissible where it is necessary to show identity, knowledge, intent, motive or to prove scienter. ***Wheeler v. State***, 536 So.2d 1347, 1352 (Miss. 1988); ***Carter v. State***, 450 So.2d 67 (Miss. 1984); ***Robinson v. State***, 497 So.2d 440, 442 (Miss. 1986). *See also* M.R.E. 404(b). Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury. ***Brown v. State***, 483 So.2d 328, 330 (Miss. 1986).

¶31. In the case at bar, evidence of the prior physical altercation between Wilkerson and Simmons was not offered to show Simmons's character. The evidence was presented as an integral part of the story for the purpose of showing intent and establishing motive.

¶32. This Court in ***Ballenger*** stated:

> Even where evidence of other crimes is admissible under M.R.E. 404(b), it cannot be admitted unless it also passes muster under M.R.E. 403.

***Ballenger***, 667 So.2d at 1257.

¶33. Upon admitting the evidence under M.R.E. 404(b), the Court must still consider the admission of the evidence in connection with M.R.E. 403. ***Stallworth v. State***, 797 So.2d 905, 910 (Miss. 2001); ***Ballenger***, 667 So.2d at 1257. M.R.E. 403 provides for the exclusion of evidence, even if it is relevant, where the risk of undue prejudice would outweigh the evidence's probative value. *See* M.R.E. 403.

¶34. In the case at hand, the trial court conducted a hearing outside the presence of the jury in order to hear

Purvis's testimony regarding the prior altercation between Wilkerson and Simmons. The trial court held that the evidence of the prior physical altercation was probative as to Simmons's state of mind and motive. The trial court further determined that the probative value of the evidence outweighed the prejudicial effect of admitting the evidence.

¶35. The prejudicial effect of this testimony did not outweigh its probative value. Therefore, the evidence was properly admitted.

### III. Hearsay Statements

¶36. While in issue II we addressed Simmons's objection to the introduction of the prior altercation, Simmons further contends that the trial court erred in allowing Purvis to testify as to what Wilkerson told her had happened during the "alleged spat" between Simmons and Wilkerson. However, Simmons does not specifically quote any alleged hearsay testimony made by Purvis.

¶37. Simmons argues that the hearsay statement was received and offered for the truth of the matter stated therein. Simmons contends that the testimony does not comply with the provisions as set forth in M.R.E. 804(a) & (b).

¶38. The record reflects that when the State questioned Purvis as to what Wilkerson told her had happened, the trial court sustained Simmons's objection and did not allow the testimony. The transcript of the exchange was as follows:

> State: How long did she (Wilkerson) have to stay in the hospital?
>
> Purvis: A few hours.
>
> State: Did you get to talk to her after that?
>
> Purvis: Yes
>
> State: What did she tell you happened?
>
> Purvis: That he --
>
> Defense: Object to the hearsay, Your Honor.
>
> State: Your Honor, the witness is unavailable.
>
> Defense: We can have a hearing on that, Your Honor, that that [sic] doesn't mean they can get into hearsay.
>
> Court: I'm going to sustain the objection.

¶39. When Simmons's counsel objected to the introduction of what Wilkerson said had happened, the trial court timely sustained the objection. Purvis never answered the State's question before Simmons's attorney objected to the question.

¶40. Once the trial court sustained Simmons's objection, there is no error. *Smith v. State*, 724 So.2d 280, 315 (Miss. 1998); *Cotton v. State*, 675 So.2d 308, 314 (Miss. 1996); *Walker v. State*, 671 So.2d 581,

616 (Miss. 1995); ***Perry v. State***, 637 So.2d 871, 874 (Miss. 1994); ***Simpson v. State***, 497 So.2d 424, 431 (Miss. 1986); ***Bradford v. State***, 759 So.2d 434, 439 (Miss. Ct. App. 2000).

¶41. This issue is without merit.

## IV. Cumulative Error.

¶42. Simmons finally argues that the alleged cumulative errors require reversal. In ***Jenkins v. State***, 607 So.2d 1711, 1183 (Miss. 1992), this Court stated that "errors in the lower court that do not require reversal standing alone may [be] nonetheless when taken cumulatively require reversal." However, in this case sub judice, this Court finds no reversible error that has been shown to have any merit. This Court stated where "there is no reversible error in any part, so there is no reversible error to the whole." ***Coleman v. State***, 697 So.2d 777, 787 (Miss. 1997). Since Simmons has not shown any reversible error, this assignment of error is without merit.

## CONCLUSION

¶43. For all the foregoing reasons, the judgment of the Hinds County Circuit Court is affirmed.

¶44. **CONVICTION OF DELIBERATE DESIGN MURDER IN VIOLATION OF MISS. CODE ANN. § 97-3-19 (1) AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, P.J., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. PITTMAN, C.J., AND McRAE, P.J., CONCUR IN RESULT ONLY.**