CARLTON, J., for the Court.
 

 ¶ 1. A Tunica County grand jury indicted Terry Lee Madden for the murders of Andy McCorkle (Andy) and Laura Willis (Laura). A jury convicted Madden of both murders. He was subsequently sentenced to life in the custody of the Mississippi Department of Corrections (MDOC) for each of the murders, with the sentences to run concurrently. Feeling aggrieved by the judgment of the trial court, Madden now appeals his convictions and sentences.
 

 FACTS
 

 ¶ 2. The murders occurred sometime around 6:52 a.m. on the morning of July 14, 2007. Deputy Shundrica Harris of the Tunica County Sheriffs Department testified that she went on duty at 5:45 a.m. on July 14. She returned to her residence sometime that morning to retrieve a headset for her cellular phone. Upon leaving her home, Deputy Harris noticed an eighteen-wheeler and a Chevrolet Malibu parked across the street, “kind of out of place.” Harris noticed that the truck and the car had broken windows. Deputy Harris drove up the street to turn around. She reported the incident to her supervisor and called for backup.
 

 ¶ 3. When she returned to the scene, another car was parked at the scene, and the car’s three occupants were flagging her down. Deputy Harris asked the onlookers to leave. She then noticed a female “laid over” in the car with a wound to the neck. Andy’s body was found in his eighteen-wheeler, also with a gunshot wound. The victims’ personal belongings were still in their vehicles. Laura’s wallet was recovered from her car, and it contained several hundred dollars in cash.
 

 ¶ 4. Laura and Madden had been involved in a romantic relationship for sixteen years. The couple lived together in Tallahatchie County, Mississippi, until January 2007, when the couple separated. Laura moved in with her sister, Barbara Willis (Barbara), for four months after separating from Madden. She then moved to her own apartment in Tunica, where she worked at the Gold Strike Casino.
 

 ¶ 5. Andy drove an eighteen-wheeler. Andy and Laura engaged in an affair beginning in 2002. The affair caused Andy and his wife, Gwen, to separate in 2002. However, the couple reunited sometime later. Investigators ruled out Gwen as a suspect in the murders.
 

 ¶ 6. After a jury trial, the jury convicted Madden of the murders. On appeal, he raises the following assignments of error: (1) the verdicts are against the overwhelming weight of the evidence; (2) the evidence was legally insufficient to suppox*t
 
 *569
 
 the guilty verdicts; (B) the State failed to meet its burden of proof in this case based on circumstantial evidence; (4) evidence of Madden’s prior bad acts was improperly admitted into evidence; and (5) cumulative error requires reversal. For clarity, we have combined Madden’s first three issues for discussion.
 

 DISCUSSION
 

 I. Whether the jury verdicts are based on legally sufficient proof or are contrary to the overwhelming weight of the evidence.
 

 ¶ 7. In order to find Madden guilty of murder, the law required the jury to conclude, beyond a reasonable doubt, that Madden had killed Andy and Laura without authority of law and with deliberate design to effect their deaths.
 
 See
 
 Miss. Code Ann. § 97-3-19(l)(a) (Rev.2006). Madden argues that the trial court erred in denying his motion for a new trial and his motion for a judgment notwithstanding the verdict. Further, Madden argues that the State failed to meet its burden of proof for a circumstantial-evidence case.
 

 a. Sufficiency of the Evidence
 

 ¶ 8. Madden argues in his brief that the trial court erred in denying his motions for a directed verdict and for a judgment notwithstanding the verdict (JNOV) because the evidence presented at trial was legally insufficient to support the jury’s verdict. Regarding the legal sufficiency of the evidence, the supreme court in
 
 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005) explained:
 

 [I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for [a] judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.
 

 (Internal citation and quotations omitted). Further, the appellate court should examine the evidence in the light most favorable to the prosecution and determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (citation omitted). This Court will reverse a conviction only if, upon examination of the evidence, we find that the evidence “point[s] in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.”
 
 Id.
 
 (citation omitted). However, this Court will affirm even when the evidence is of such quality and weight that “reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.”
 
 Id.
 
 In sum, a reversal on the grounds of insufficient evidence means that an acquittal was the
 
 only
 
 proper verdict for the defendant.
 
 Id.
 
 at 844(¶ 18).
 

 ¶ 9. When the evidence in a criminal case consists of purely circumstantial evidence, as in this case, this Court must scrutinize the jury’s verdict more closely. The supreme court has articulated the following standard of review in circumstantial-evidence eases:
 

 [T]he test to be applied in considering the sufficiency of the proof is whether a rational fact[-]finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged. Put another way, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and
 
 *570
 
 a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt.
 

 Shields v. State,
 
 702 So.2d 380, 382 (Miss.1997) (internal citations and quotations omitted). Madden contends that the alibi evidence he presented gave nearly equal support to his theory of innocence as the State’s evidence gave to a theory of guilt. Therefore, Madden argues that the State failed to meet its burden of proving guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with his innocence, as required in a circumstantial-evidence case.
 
 See Rubenstein v. State,
 
 941 So.2d 735, 785 (¶ 225) (Miss.2006).
 

 ¶ 10. Madden presented four witnesses to testify that he was in Sumner, Mississippi, approximately sixty miles from where the murders occurred, on the morning of July 14th. Corey Gee, Madden’s friend, testified that he saw Madden between 8:00 a.m. and 8:05 a.m. on a bridge by the First Baptist Church in Sumner. Madden and Gee were both riding motorcycles and stopped to talk about repair work Madden planned to perform on Gee’s vehicle, a green Tahoe. Gee testified that he gave Madden the keys to the Tahoe the night before, and the truck had been towed by the time he left his home on July 14th at approximately 8:00 a.m. Gee did not see Madden tow his vehicle, and he did not know what time the vehicle was towed. Gee testified that Madden stated that his phone was “ringing off the hook, and he heard that [Laura] had been shot.” Gee testified that Madden told him that he was going to “check things out.”
 

 ¶ 11. Madden’s second witness, Todd Logan, testified that he lives next to Madden in Tallahatchie County. Madden maintains his auto repair shop on the property. Logan testified that on the morning of the murders, he left his house at approximately 6:15 or 6:20 a.m. He returned home “between about 6:30, maybe — between 6:30 and maybe 15, 20 minutes after 7:00.” When he returned home, Logan heard some “clanging” behind Madden’s wrecker. A few moments later, he heard Madden’s motorcycle crank inside Madden’s shop. Logan never actually saw Madden that morning.
 

 ¶ 12. Todd Clark testified for Madden. Clark lived across the street from Madden. He left his home to go to the store at approximately 7:30 a.m. on the morning of the murders. As he left his home, Clark noticed that Madden’s shop door was open, and his wrecker, with a green Tahoe attached, was located in front of Madden’s shop. Clark never saw Madden that morning.
 

 ¶ 13. Lastly, James Morris, who owned an auto shop in Sumner, testified that Madden visited his shop the morning of the murders at 8:05 a.m., the same time that Gee testified he had seen Madden on the bridge by the First Baptist Church.
 

 ¶ 14. Despite Madden’s alibi witnesses, the State presented evidence at trial sufficient to support the guilty verdicts. The evidence, examined in the light favorable to the prosecution, revealed a prolonged but intermittent tumultuous relationship between Madden and Laura. Laura’s sister, Barbara, testified that Madden mistreated Laura and that she once heard Madden threaten to kill Laura if he found out she was “going with a truck driver.” Before her murder, Laura lived with her sister for a time, because, as Barbara testified, Laura was “tired of running from [Madden].”
 

 ¶ 15. A firearm-identification expert testified that the victims were killed by a .40-caliber handgun. Agent Chuck Poe of the Mississippi Bureau of Investigation testified that he had interviewed Madden after the murders. During this interview,
 
 *571
 
 Madden told Agent Poe that the only handgun he had ever owned was a .380-caliber handgun, which had been stolen during a burglary a couple of years earlier and had not been recovered.
 

 ¶ 16. Despite Madden’s statement to Agent Poe that he had never owned a .40 caliber handgun, evidence presented at trial by different witnesses suggested that Madden had, in fact, owned a .40-caliber weapon. Deputy Clifton Bailey testified that in January 2006, about a year and a half before the murders, while working in his yard, he heard “tires squeaking” and heard Laura “hollering for help.” According to Deputy Bailey, Laura stated, “Somebody help me. Terry’s trying to kill me.”
 

 ¶ 17. Deputy Bailey ran to the road where he saw “the gun come flying out the window.” Deputy Bailey secured the weapon, a .40-caliber handgun. Madden exited the car and returned to his own car; Laura drove away. Deputy Pat Tribble, of the Tallahatchie County Sheriffs Department, arrested Madden following the incident, and Madden was subsequently charged with aggravated domestic violence. However, the charges against Madden were dropped a few months later, and Deputy Bailey personally returned the .40-caliber handgun to Madden.
 

 ¶ 18. The testimony continued to conflict with Madden’s claim that the only gun he had ever owned was a .380-caliber handgun. Bobbie Robinson, owner of Robinson Guns and Ammo, testified that Madden had purchased several guns from him in the past. Specifically, he testified that he had sold Madden a .40-caliber Ruger handgun on April 27, 2005, which was evidenced by a Form 44-73, required by the Bureau of Alcohol, Tobacco, and Firearms. As stated above, the firearm expert testified that the gunshots that killed Andy and Laura originated from a .40-caliber weapon.
 

 ¶ 19. Further, Deputy Tribble testified that he had arrested Madden at least once before, following a separate domestic disturbance between Madden and Laura. Deputy Tribble testified that Laura had bruises on her arms after that particular incident. Deputy Tribble provided no further information relative to that incident.
 

 ¶ 20. In addition to Barbara’s testimony that Madden had threatened to kill Laura, the State presented another witness who testified to hearing Madden threaten Laura’s life. Haywood Wilson lived across the street from Madden and testified that he witnessed Madden hit Laura and tell her, “Get out of my yard or I’m gonna [sic] kill you.”
 

 ¶ 21. Arthinia Saulsberry testified that she spent part of the night before the murders in Madden’s home. Madden woke her at approximately 4:00 a.m. and drove her back to her home. When he woke her, Madden was already dressed in all black. Madden had informed Saulsber-ry the night before that he had to leave early the next morning to go to the junkyard in Memphis, Tennessee. Saulsberry spoke with Madden later that same morning, around 8:00 a.m. Saulsberry testified that Madden told her that Laura had been shot “and that it was two guys dressed in black, and they ran out across the field or something, and that they could have been driving an eighteen-wheeler or something.” Further, Saulsberry testified that Madden called her again that day to inform her that he had told investigators that he spent the night with her and that he had dropped her off at her house at 5:30 a.m.
 

 ¶ 22. The victims’ personal belongings were found in their vehicles, ruling out any suggestion for investigators that the murders were committed during a robbery.
 
 *572
 
 Lastly, the State presented evidence that Madden’s cell phone connected with a tower only three or four miles from the crime scene at the time of the murders.
 

 ¶ 23. A review of the evidence in this case fails to lead this Court to find that an acquittal constitutes the only proper verdict for Madden. Examining the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could find that Madden killed Andy and Laura without authority of law and with deliberate design to effect their deaths, and to the exclusion of every reasonable hypothesis consistent with his innocence. Therefore, this issue is without merit.
 

 b. Overwhelming Weight of the Evidence
 

 ¶ 24. Madden further argues that his convictions for the murders of Laura and Andy are against the overwhelming weight of the evidence. For challenges to jury verdicts as being contrary to the overwhelming weight of the evidence, the
 
 Bush
 
 court provided the following standard of review:
 

 When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.
 

 Bush,
 
 895 So.2d at 844(¶ 18). To determine whether a verdict is against the overwhelming weight of the evidence, this Court sits as a “thirteenth juror” to examine the evidence in the light most favorable to the verdict.
 
 Id.
 
 If, upon evaluating the evidence in the light most favorable to the verdict, this Court finds itself in disagreement with the jury’s verdict, the proper remedy is to grant a new trial.
 
 Id.
 

 ¶ 25. Examining the evidence discussed above in the light most favorable to the verdict, we do not find that the verdicts are against the overwhelming weight of the evidence such that to allow the verdict to stand would sanction an unconscionable injustice.
 
 Id.
 
 Therefore, this issue is without merit.
 

 II. Whether the trial court erred in allowing hearsay testimony regarding Madden’s prior bad acts.
 

 ¶ 26. Madden argues that the trial court committed reversible error when it allowed various witnesses to testify as to his prior bad acts, including Deputy Bailey’s testimony regarding the incident with the gun, Barbara’s testimony regarding the telephone threat, Wilson’s testimony that he overheard Madden threaten Laura, and Deputy Tribble’s testimony that he saw bruises on Laura’s arm after a previous dispute.
 

 ¶ 27. We review the admission or exclusion of evidence under an abuse of discretion standard of review.
 
 Jones v. State,
 
 904 So.2d 149, 152(¶ 7) (Miss.2005). The admissibility of evidence of prior bad acts is controlled by Mississippi Rule of Evidence 404(b), which states the following:
 

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 

 ¶ 28. Madden made a timely objection at trial on the ground of relevance, which the trial judge overruled. Rule 401 of the Mississippi Rules of Evidence defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less proba
 
 *573
 
 ble than it would be without the evidence.” Rule 403 of the Mississippi Rules of Evidence provides for the exclusion of relevant evidence on the grounds of prejudice, confusion, or waste of time. Rule 403 states: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
 

 ¶29. The trial judge considered Rule 404(b) in his ruling on Madden’s objection. The trial judge stated the following on the record:
 

 Let the record show that we have taken our lunch break, that the jury, as well as the spectators have been excused. During the course of this morning’s events, a witness — I believe a Mr. Bailey and Mr. Tribble, Pat Tribble, and a Mr. Wilson were called by the State as concerns prior incidents, acts of violence between this defendant and the victim. An objection was made to this evidence by the Defense. Because the objection was made contemporaneous with the offer of evidence during trial, the Court did not state on the record its reasoning behind the admission of such evidence.
 

 The Court will at this time state, for purposes of the record, that in considering the evidence, it viewed the evidence under both Rule 403 and Rule 404(b). The Court did find the evidence to be relevant. However, it also found the evidence to be prejudicial to the defendant. However, finding that the evidence was offered — intended to present matters both as to impeachment as concerns the prior statement of the defendant and as to motive, intent, knowledge, preparation, under Rule 404(b), the Court considered the evidence to be — the probative value of the evidence to outweigh the prejudicial effect, particularly in light of the prior threats which the testimony suggested had occurred between the defendant and the victim.
 

 ¶ 30. The record reflects that the trial court carefully considered the admission of the prior bad acts under Rules 404(b) and Rule 403, ultimately allowing the evidence as proof of Madden’s motive and intent to kill Laura and Andy. This Court has previously held that previous incidents of domestic violence against the victim are admissible to show motive, intent, lack of accident, or mistake.
 
 See Moses v. State,
 
 893 So.2d 258, 264(¶ 22) (Miss.Ct.App.2004);
 
 Moss v. State,
 
 727 So.2d 720, 725(¶ 19) (Miss.Ct.App.1998). We find no abuse of discretion in the trial court’s ruling to allow the testimony regarding Madden’s prior threats against Laura or his previous arrest for domestic violence. The trial court found this evidence relevant for impeachment of a prior statement of the defendant, as well as relevant as evidence of Madden’s motive, intent, knowledge, and preparation. This issue is without merit.
 

 III. Whether the cumulative effect of the errors in the trial court warrant reversal of Madden’s convictions and sentences.
 

 ¶ 31. In his final assignment of error, Madden argues that this Court should reverse based on the cumulative effect of the errors at his trial. The Mississippi Supreme Court has held “individual errors, not reversible in themselves, may combine with other errors to make up reversible error.”
 
 Wilburn v. State,
 
 608 So.2d 702, 705 (Miss.1992). Reversal based on cumulative error is appropriate where the effect of all the errors at trial deprives the defendant of a fundamentally fair trial.
 
 Thompson v. State,
 
 990 So.2d 265, 270(¶ 12) (Miss.Ct.App.2008) (quoting
 
 Harris v. State,
 
 970 So.2d 151, 157(¶ 24)
 
 *574
 
 (Miss.2007)). “[Rjeversal based upon cumulative error requires a finding or findings of error.”
 
 Id.
 
 Having found no error, harmless or otherwise, we find no cumulative error warranting a reversal of Madden’s convictions. Therefore, this issue is without merit.
 

 ¶ 82. THE JUDGMENT OF THE TU-NICA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF LIFE; AND COUNT II, MURDER, AND SENTENCE OF LIFE, WITH THE SENTENCES TO RUN CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT.