# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00763-COA

GEORGE AFFLECK A/K/A GEORGE M.
AFFLECK A/K/A GEORGE MARCUS AFFLECK                    APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

DATE OF JUDGMENT:              04/16/2013
TRIAL JUDGE:                   HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: ALICIA MARIE AINSWORTH
DISTRICT ATTORNEY:             ROBERT SHULER SMITH
NATURE OF THE CASE:            CRIMINAL - FELONY
TRIAL COURT DISPOSITION:       CONVICTED OF CAPITAL MURDER AND
                               POSSESSION OF A FIREARM BY A
                               CONVICTED FELON AND SENTENCED
                               TO TWO CONSECUTIVE LIFE
                               SENTENCES IN THE CUSTODY OF THE
                               MISSISSIPPI DEPARTMENT OF
                               CORRECTIONS, WITHOUT ELIGIBILITY
                               FOR PAROLE
DISPOSITION:                   AFFIRMED – 12/15/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., MAXWELL AND FAIR, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     George Affleck appeals his convictions of capital murder and possession of a firearm

by a felon.  Affleck argues his convictions should be reversed because:  (1) the trial court

improperly admitted statements to police under the excited-utterance exception to the hearsay rule; (2) the trial court erroneously allowed testimonial statements to police into evidence in violation of the Confrontation Clause; (3) the trial court erroneously allowed the State to present irrelevant and unauthenticated evidence; (4) the trial court erroneously allowed the State to introduce prior-bad-acts testimony; (5) the evidence was insufficient to support the felon-in-possession-of-a-firearm conviction; (6) a new trial is warranted under the doctrine of retroactive misjoinder; (7) none of the errors raised are harmless; and (8) the cumulative effect of the errors necessitates reversal.

¶2.     We find no reversible error and affirm.

FACTS[1]

¶3.     On May 22, 2011, around 10:30 or 11:30 p.m., Sunny Day Bayham was awakened by the sound of her dogs barking. She looked outside and saw Affleck in her next-door neighbor Diane Hearn's yard. Affleck was "screaming and yelling and throwing [Hearn] around, trying to get her in his truck," which was parked in Hearn's front yard. Hearn tried to run, but Affleck grabbed her by her hair and pulled her back. She escaped from the truck

---

[1] On the first day of trial during lunch, the court reporter fell and injured herself. She was hospitalized, and her notes and some of her audio recordings from the first half of the day were lost. Affleck's counsel filed a Mississippi Rule of Appellate Procedure 10(c) statement of the evidence on September 30, 2013, in lieu of the missing portions of the transcript. Affleck responded, pro se, objecting to the Rule 10(c) statement. Counsel filed an amended Rule 10(c) statement on November 6, 2013, incorporating most of Affleck's suggested changes and additions. The amended Rule 10(c) statement summarizes the testimonies of Detective Mark Kuppler, Officer Dwayne Smith, and Investigator Felix Hodge. On April 4, 2014, Affleck filed in this Court a pro se "Motion to Remand for New Trial," based on the lack of a complete transcript. The motion was denied. No issue is raised on appeal as to the missing portion of the transcript.

once, and Bayham, who had come outside, called out to Hearn to see if she needed help. Hearn did not respond, but Affleck yelled at Bayham to go back inside her house or she "could have some of the same." Affleck then threw Hearn against the side of a tree. He "yanked her up," threw her into the truck, and slammed the door, telling her, "don't get out again or you'll be sorry." Affleck got in the truck and drove off. Bayham did not call the police because of Affleck's threat.

¶4.    Hearn's next-door neighbor on the opposite side, Ylandra Chambers, was also awakened on the night of May 22, 2011. She could hear the sound of Affleck's voice, and, from her window, she could see Affleck in Hearn's yard. Affleck was yelling at Hearn. His truck was parked in Hearn's yard with the headlights on, although he usually parked in the driveway. Chambers sent Hearn a text message to ask if she was okay. Hearn later tried to call Chambers, but Chambers had fallen asleep and missed the call. Chambers testified that she had called the police twice in 2009 when she heard Hearn and Affleck yelling at each other.

¶5.    Michelle Rushing was visiting a friend, Wendy Beckham, on May 22, 2011, at Beckham's house on Creston Avenue in Jackson, Mississippi. Beckham's house is approximately three houses down from Affleck's, on the opposite side of the street. Around 9 p.m., Rushing and Beckham were out front, when they saw Affleck come out of his house. Rushing testified Affleck was "yelling at some Mexican guys" in another neighbor's house, and "he threw a chair at them." Affleck then left in his truck and returned "not too long" afterwards with a white female. According to Rushing, Affleck stopped the truck in the

middle of the street. The two were fighting, and Affleck was "really beating her." The female opened the truck door and tried to get out, but Affleck pulled her back into the truck. Rushing heard Affleck threatened to kill the female, and he was asking her, "how much did you pay them?" Affleck then drove the truck into his driveway. The female jumped out and ran into Affleck's house. Affleck followed her. Rushing did not see the female again. Beckham testified consistently with Rushing. She heard Affleck say, "B----, I'm going to kill you," as he was trying to keep the female from escaping his truck. She heard the female screaming and yelling for help, and saying, "please don't, please don't." Although both Rushing and Beckham testified they heard Affleck threaten to kill the female, neither mentioned this in their statements to police.

¶6. Pedro Lugo lived and worked with Affleck. Lugo was asleep on the night of May 22, 2011, when another roommate, Reyes Cruz, woke him and said Affleck and Hearn were fighting in Affleck's bedroom. After two or three hours of hearing Affleck and Hearn yelling at each other, Lugo and Cruz left around 11:30 p.m. to stay in a hotel in Clinton, Mississippi. Lugo was scared of Affleck because he had a gun and a "big knife" in a holster on his waist. Before they left, Lugo saw Hearn lying on the floor in Affleck's room. Her face was bloody, but she was breathing. Lugo drove back to the home the next morning around 7:30 or 8 a.m. On his way back, he called police out of concern for Hearn. Affleck was in the front yard when Lugo arrived. Lugo did not go inside.

¶7. Cruz, who only spoke Spanish, testified through a translator that he also lived with Affleck. On the night of May 22, 2011, he was outside when Affleck and Hearn got out of

4

Affleck's truck. They were fighting. Hearn ran into the house, and Affleck chased her from room to room. Affleck was pushing her. She was crying and trying to defend herself. Cruz testified he could not sleep because the fighting was so loud, so he and Lugo chose to leave to get a hotel room. Prior to leaving, Cruz saw Hearn lying on the floor in Affleck's bedroom. Her face was bruised. When he returned to the house the next morning, Affleck was mopping up what appeared to be blood, and Affleck's clothes from the night before were hanging up wet in the bathroom. Also, the bed was gone from Affleck's room. Cruz did not see Hearn.

¶8.     On May 23, 2011, Kurt Affleck, a Texas resident, reported to the Grapevine, Texas Police Department that his brother, Affleck, had telephoned him around 5 a.m. and told him that he had struck his girlfriend, Hearn. Kurt told Detective Mark Kuppler that Affleck had told him that Hearn was bleeding, and that it was "bad." Kurt knew Affleck had residences in Texas and Mississippi, although he did not know the Mississippi address. When neither Affleck nor Hearn was found at Affleck's Texas address, Detective Kuppler notified the Jackson, Mississippi Police Department of the information relayed to him in the phone call.

¶9.     Two Jackson police officers, Investigator Felix Hodge and Officer Dwayne Smith, drove to Affleck's home on Creston Avenue at approximately 8:20 a.m. on May 23, 2011, to conduct a welfare check for Hearn's safety. Affleck was outside. He refused to let them in the house without a search warrant. The officers saw what appeared to be blood on the exterior of two trucks in the yard, one of which was Affleck's Ford F-150. Then they noticed smoke coming from Affleck's backyard. They walked around the house and found a burning

5

mattress. They also saw what appeared to be more blood on a shed and other items in the backyard. A spent shell casing was on the ground. Affleck was detained for questioning, as the officers called for backup and secured the scene. Detective Eric Smith went to Hearn's house and knocked on the door, but no one answered. Detective Smith noticed tire tracks in Hearn's front yard. And he saw Affleck's business cards for his roofing business and roofing nails scattered in the yard.

¶10.   A search warrant was obtained for Affleck's Jackson home. Police found bloody boots and blood spattered on "everything" in Affleck's bedroom. Chemical testing revealed the presence of blood in the corner of Affleck's bedroom and throughout the house. Swabs taken from Affleck's bedroom revealed Hearn's DNA. There was no bed in the front bedroom. A 20-gauge Mossburg shotgun was found in the shed behind the house. Affleck's F-150 was searched and swabbed. A partial profile of Hearn's DNA was found on the steering wheel. A golf club, black rubber bungee straps, a black knuckle-handled knife, a silver hunting knife, and brass knuckles were found inside Affleck's truck. Blood was found on the bed liner of the truck.

¶11.   On May 24, 2011, Steve Evans discovered various bloody items in a dumpster at his place of business on the Interstate 55 frontage road in Jackson, less than a mile from Affleck's home. He notified police, who recovered over fifty bloody items from the dumpster, including a t-shirt, white bra, blue jeans, towels, and notepads. A black tie-down cord was also found. The t-shirt and bra contained both Affleck's and Hearn's DNA.

¶12.   On May 26, 2011, an individual found a wallet next to Interstate 20 near Bolton,

6

Mississippi. Police searched the area and found Hearn's phone. Later that same day, Bolton police received a call that a motorist had seen a body in the grass along Interstate 20. Police discovered the body of a white female. Dental records confirmed it was Hearn's body. Hearn's hands were above her head, as if she had been dragged there. Police found rubber bungee straps and a night-light cover near Hearn's body. The night-light cover was examined for fingerprints, but none were recoverable. Although Hearn's body was partially decomposed, the forensic pathologist was able to determine that her death was a homicide caused by severe blunt-force trauma. The forensic pathologist also testified that Hearn had possibly been stabbed or cut. Bones in her neck were fractured, consistent with either strangulation or blunt-force trauma. She had multiple fractures on her face and right hand, and eleven broken ribs. Cell phone records placed both Affleck's and Hearn's cell phones in Bolton on the morning of May 23, 2011. These records also showed Affleck's call to his brother at 5 a.m. on May 23 was made near Bolton.

¶13. A Hinds County Circuit Court jury found Affleck guilty of capital murder and being a felon in possession of a firearm. He was sentenced as a habitual offender under Mississippi Code Annotated section 99-19-83 (Supp. 2014) to two consecutive life sentences in the custody of the Mississippi Department of Corrections without the possibility of parole. Affleck's posttrial motions for a judgment notwithstanding the verdict and for a new trial were denied. Affleck now appeals.

## DISCUSSION

I. *Excited-Utterance Exception to the Hearsay Rule*

7

¶14. Affleck argues his conversation with Kurt, as relayed by Detective Kuppler at trial, was hearsay within hearsay, for which no exception applied. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). "Hearsay is not admissible except as provided by law." M.R.E. 802. A trial court's admission or exclusion of evidence is reviewed for abuse of discretion. *Smith v. State*, 136 So. 3d 424, 431 (¶17) (Miss. 2014).

¶15. Due to the court reporter's injury during trial, Detective Kuppler's testimony is not part of the record. Kurt did not testify, as he was unavailable for trial. The Mississippi Rule of Appellate Procedure 10(c) statement of the evidence, drafted by Affleck's counsel, summarizes Detective Kuppler's testimony as follows:

> Det. Kuppler testified that on May 23, 2011, he had a conversation with George Affleck's brother Kurt Affleck[,] a resident of Texas. Det. Kuppler testified that Kurt Affleck informed him that George Affleck telephoned Kurt Affleck at approximately 5:00 a.m. on May 23, 2011, and told Kurt that he (George Affleck) had hurt his girlfriend Diane Hearn. George allegedly told Kurt that George had struck Hearn, she was bleeding and that it was "bad." Kuppler testified that Kurt Affleck identified George Affleck's cellular telephone number and the time the call was received.
>
> Det. Kuppler testified that Kurt Affleck did not know where George Affleck was and that the details of Kurt's statement were communicated to the Jackson Police Department when neither George Affleck nor Diane Hearn were located at George's Texas residence. Kuppler subsequently took a written statement from Kurt Affleck on May 25, 2011. Kuppler read to the jury the statement he took from Kurt Affleck[,] which is attached hereto as Exhibit "A." . . . Det. Kuppler advised that he did not know Kurt Affleck and had no knowledge or opinion of his credibility, reliability[,] or history for truthfulness.

¶16. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule[.]" M.R.E. 805.

8

Affleck concedes that his conversation with Kurt is excepted from the hearsay rule as a statement against interest. *See* M.R.E. 804(b)(3). He argues, however, that no exception applies to Kurt's conversation with Detective Kuppler.

¶17. Over an objection, the trial court found Kurt's conversation with Detective Kuppler admissible under the excited-utterance exception to the hearsay rule. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). "The underlying theory of the excited[-]utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication." *Id.* cmt. "[T]he essential ingredient . . . is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly." *Id.*

¶18. The record does specify exactly how much time passed between Affleck's call to Kurt and Kurt's conversation with Detective Kuppler. However, we know that Affleck called Kurt at approximately 5 a.m. Phone records show the call lasted approximately seven and a half minutes. Kurt contacted Texas police, who unsuccessfully tried to locate Affleck and Hearn at Affleck's Texas address. Jackson police were then contacted and responded to Affleck's home at approximately 8:20 a.m. Consequently, the time span between Affleck's call to Kurt and Kurt's conversation with Detective Kuppler was no more than approximately three hours.

¶19. "The issue of spontaneity must be determined in a case[-]by[-]case analysis, and the

9

length of time between the incident creating the excitement and the statement can vary widely." *Carter v. State*, 722 So. 2d 1258, 1261 (¶11) (Miss. 1998). Affleck's early-morning phone call awakened and startled Kurt. Kurt was worried for Hearn's safety, and Kurt spoke to Detective Kuppler within a relatively short time of his conversation with Affleck. We cannot find the trial court abused its discretion in finding Kurt's statements qualified as excited utterances.

¶20. We next must determine whether the trial court properly found the testimony was more probative than prejudicial. Although otherwise admissible, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. Kurt's call to police was essential for the jury to understand why Affleck was ultimately arrested. As the Mississippi Supreme Court has held, "in any criminal prosecution the State is entitled to tell 'a rational and coherent story'" of the events surrounding the crime. *Turner v. State*, 478 So. 2d 300, 301 (Miss. 1985) (quoting *Neal v. State*, 451 So. 2d 743, 759 (Miss. 1984)). The testimony was probative to present the jury with a complete account of the facts of the case. Kurt's conversation with Detective Kuppler led police to search for Hearn out of concern for her safety, which led to Affleck's arrest. There is no evidence the testimony was unduly prejudicial. We cannot find the trial court abused its discretion in admitting Kurt's conversation with Detective Kuppler into evidence.

¶21. We further find that even if the trial court erred in admitting the testimony, the

admission was harmless error, considering the overwhelming evidence against Affleck. Shortly before Hearn's murder, eyewitnesses saw Affleck throw her against a tree, chase her, hit her, and restrain her by grabbing her hair. Witnesses heard Affleck yell at Hearn and threaten to kill her while she cried for help and pleaded with him to stop. Two witnesses saw Hearn lying on the floor in Affleck's bedroom, bloody and bruised. Hearn's blood was spattered throughout Affleck's house and truck. Affleck was seen mopping up blood, and his mattress had been set on fire in the backyard. Clothing bearing Affleck's and Hearn's DNA was found in a dumpster near Affleck's house. And Affleck's cell phone pinged near the location of Hearn's body around the time of the murder. Given the testimony and physical evidence against him, even if the trial court incorrectly admitted the testimony, Affleck has not shown how he was prejudiced. This issue is without merit.

## II. Confrontation Clause

¶22. Affleck next argues that the admission of Kurt's statement to Detective Kuppler into evidence violated his constitutional right to confront all witnesses against him.

¶23. "[U]nder the Sixth Amendment Confrontation Clause, testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine the witness." *Galloway v. State*, 122 So. 3d 614, 636 (¶42) (Miss. 2013) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). The "introduction of evidence admitted via a hearsay exception does not necessarily foreclose Confrontation[-]Clause scrutiny." *Birkhead v. State*, 57 So. 3d 1223, 1233 (¶36) (Miss. 2011). We review an objection based on an alleged Confrontation-Clause

11

violation de novo. *Id.* at (¶35).

¶24. It is undisputed that Kurt was unavailable for trial and that there was no prior opportunity for cross-examination; thus, our focus is on whether Kurt's conversation with Detective Kuppler was testimonial. A statement is testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Corbin v. State*, 74 So. 3d 333, 338 (¶13) (Miss. 2011) (citation omitted). In determining whether a statement is testimonial, we look to the statement's primary purpose. *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015). When a statement is made "to respond to an 'ongoing emergency,' its [primary] purpose is not to create a record for trial and thus is not within the scope of the Confrontation Clause." *Id.* But "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," the statement is testimonial and subject to the Confrontation Clause. *Birkhead*, 57 So. 3d at 1234 (¶37) (citation omitted).

¶25. "[A] 911 call is generally nontestimonial as it is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance[.]" *Id.* (citation and internal quotation marks omitted). Likewise, statements made during a police interrogation are nontestimonial when the "circumstances objectively indicat[e] that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* However, "an affidavit obtained by an interrogating officer in the absence of emergency circumstances [i]s testimonial." *Id.*

12

¶26. Kurt contacted police out of ongoing concern for Hearn's safety. He was unaware of Affleck's or Hearn's location, and he was unaware that Hearn had been killed. He was concerned she may be hurt and in need of assistance. There is no evidence that Kurt was attempting to implicate Affleck of a crime. There is also no evidence that Kurt contemplated that his conversation with police would be used later at a trial against Affleck. Kurt's call was made so police could "resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *See Sanders v. State*, 77 So. 3d 484, 488 (¶13) (Miss. 2012) (quoting *Davis v. Washington*, 547 U.S. 813, 827 (2006)).

¶27. While Kurt signed a written statement on May 25, 2011—two days after Affleck was taken into custody but before Hearn's body was discovered—the written statement was not admitted into evidence. Detective Kuppler, who had typed the statement, read from it at trial. The written statement restated what Kurt had told Detective Kuppler over the phone. Because the written statement was not admitted into evidence, Affleck's challenge is limited to Detective Kuppler's testimony regarding the statement. *See Hingle v. State*, 153 So. 3d 659, 661-62 (¶5) (Miss. 2014) (The "report was not admitted into evidence, so [the appellant] does not challenge the admissibility of the report . . . ; she takes issue with [the witness's] testimony [regarding the report] only.").

¶28. We find Kurt's conversation with Detective Kuppler was nontestimonial and was properly admitted at trial. Even if a violation occurred, any error was harmless given the weight of the evidence against Affleck.

III.    *Relevancy and Authenticity of Evidence Found at the Crime Scene*

13

¶29. Affleck argues the following evidence presented by the State at trial was irrelevant, untested for DNA, unauthenticated, and unduly prejudicial:  a golf club, a knife on a pole, hair fibers, a rubber strap, a mop, and brass knuckles.

¶30. "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  M.R.E. 401.  "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by these rules.  Evidence which is not relevant is not admissible."  M.R.E. 402.  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"  M.R.E. 403.  The admission of evidence is reviewed for abuse of discretion.  *Smith*, 136 So. 3d at 431 (¶17).  We "will not reverse a conviction unless the trial court abused its discretion in a manner that was prejudicial to the accused."  *Id.* at 431-32 (¶17).

¶31. In ruling on a renewed objection during trial to the introduction of the golf club, various knives, and brass knuckles, the trial court held:

> [As to] the silver hunting knife and the golf club, I previously ruled that there is some probative value on those.  I believe there is some probative value with the hunting knife on the . . . handle, although minimal[;] I don't believe there's the substantial danger of unfair prejudice.  It's a close[] question, but, you know, simply a hunting knife on a handle, I don't believe, is dangerously prejudicial, and there is some probative value in that.

¶32. "Where a trial court determines that potentially prejudicial evidence possesses sufficient probative value, it is within that court's sound discretion whether or not to admit [the] same, since [Rule] 403 does not mandate exclusion but rather provides that the evidence

14

may be excluded." *Burleson v. State*, 166 So. 3d 499, 508 (¶25) (Miss. 2015) (quoting *Jones v. State*, 904 So. 2d 149, 152 (¶7) (Miss. 2005)). In *Burleson*, the appellant, who was convicted of capital murder, argued that the State's introduction of a gun into evidence was more prejudicial than probative, since it was undisputed the gun was not used in the crime. The supreme court found the argument without merit, reasoning as follows:

> [W]eapons found near the place where the defendant was arrested are admissible, "even where it is not claimed nor proved that they were used in the commission of the alleged crime in cases where the evidence has probative weight, or where they constitute a part of the surrounding scene or picture, or are a part of the circumstances of the arrest." *Wilkins v. State*, 264 So. 2d 411, 413 (Miss. 1972).

*Burleson*, 166 So. 3d at 508 (¶26).

¶33. All of the introduced items were found either in Affleck's home or truck, both crime scenes and near the place of Affleck's arrest. The trial court found that the evidence was probative, even if minimally so, and its probative value outweighed any prejudicial effect. The knife, golf club, and brass knuckles were probative, as the forensic pathologist testified that Hearn had suffered blunt-force trauma and multiple cuts or stab wounds. These items, as well as the hair fibers, rubber strap, and mop, constituted a part of the surrounding scene of the crime and were probative. Affleck has not shown how he was prejudiced by the introduction of any of the items. Affleck had the opportunity to cross-examine the witnesses who testified regarding the evidence, and to emphasize to the jury his argument that the items were not used in the commission of the crime. We cannot find the trial court abused its discretion in allowing the items to be introduced into evidence.

¶34. We also find no merit to Affleck's argument that the complained-of evidence was not

15

properly authenticated under Mississippi Rule of Evidence 901. Rule 901 requires "authentication or identification as a condition precedent" to the admission of an item into evidence. M.R.E. 901(a). To meet this requirement, the proponent must show "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* No objection was made at trial to the authenticity of the items, and this assertion cannot now be brought for the first time on appeal. *See Leedom v. State*, 796 So. 2d 1010, 1019 (¶31) (Miss. 2001). Regardless, crime-scene investigators who collected the evidence testified that the items were in fact those found at the crime scene. This issue is without merit.

*IV.    Prior Bad Acts*

¶35.    Hearn's neighbor, Chambers, testified, over an objection, that she called the police twice in 2009 because she heard "a lot of screaming and yelling" while Affleck was at Hearn's house. Affleck argues this was inadmissible prior-bad-acts evidence, solely used to attack his character.

¶36.    Mississippi Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

If testimony is found admissible under an exception to Rule 404(b), the trial court must then weigh the prejudicial effect against its probative value under Rule 403. *Stone v. State*, 94 So. 3d 1078, 1084 (¶18) (Miss. 2012). "[W]hen evidence which is admissible for one purpose but not admissible for another purpose is admitted, the court, upon request, shall restrict the

16

evidence to its proper scope and instruct the jury accordingly." *Brown v. State*, 890 So. 2d 901, 913 (¶36) (Miss. 2004) (quoting M.R.E. 105).

¶37.   It must be noted that while Affleck initially objected to Chambers's testimony as inadmissible prior-bad-acts testimony, he later conceded that Chambers's testimony as to what she heard and saw in 2009 was admissible.  Upon counsel's initial objection, the trial court heard a proffer of Chambers's testimony outside the presence of the jury.  The trial court found the testimony was admissible as long as the prior domestic-violence incidents were not remote in time and were within Chambers's firsthand knowledge.  The trial court also found the testimony was more probative than prejudicial.  After this ruling, counsel stated: "I have no problem with . . . her talking about they argued in 2009.  That part of her testimony, I don't think, is objectionable, because she is the declarant.  She's subject to cross, and I can ask her about it, if I want to go in there."  Counsel clarified that the specific objection was regarding what criminal charges, if any, were brought against Affleck after the 2009 incidents.  The trial court then asked the State: "But you're not going to elicit from Ms. Chambers anything about a conviction of this Defendant[,] [i]s that correct?"  The State responded, "That's right, [Y]our Honor."

¶38.   Chambers testified that after the second incident, police and paramedics responded to Hearn's house, but she did not testify as to any charges brought against Affleck after either incident.  She only testified she became concerned when she heard Affleck at Hearn's house on May 22, 2011, "[b]ecause he [was]n't supposed to be[] over there."

¶39.   Affleck requested a limiting instruction be given to the jury. Affleck's counsel drafted

17

the instruction, which the trial court read to the jury:

> Concerning Ms. Chambers's testimony, the court instructs the jury that evidence of alleged prior acts of the Defendant may not be considered by you as proof of the Defendant's character or as proof the Defendant acted in conformity on the date in question, May 22, 2011. But it may be considered for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or . . . absence of mistake or accident.

¶40. We find Affleck is procedurally barred from arguing the trial court improperly admitted Chambers's testimony. Affleck conceded his objection to Chambers's eyewitness testimony of the events that happened in 2009, so this argument is waived. *See Boyd v. State*, 977 So. 2d 329, 337 (¶33) (Miss. 2008) (holding that failure to object to the admissibility of evidence waives the issue for appeal). Affleck's specific objection was to testimony regarding any criminal charges brought as a result of the 2009 incidents. But Chambers did not testify regarding any criminal charges. Further, a limiting instruction was given to the jury, at Affleck's request. For these reasons, Affleck cannot now argue that Chambers's testimony should have been excluded under Rule 404(b).

¶41. Regardless, we find no error in the admission of the testimony. This Court has "held that previous incidents of domestic violence against the victim are admissible to show motive, intent, lack of accident, or mistake." *Madden v. State*, 42 So. 3d 566, 573 (¶30) (Miss. Ct. App. 2010). In *Simmons v. State*, 813 So. 2d 710, 715 (¶27) (Miss. 2002), cited by the trial court in support of its decision to admit Chambers's testimony, a witness testified to an act of domestic violence by the defendant, Simmons, that occurred approximately three months prior to the victim's murder. Simmons argued the testimony was inadmissible under Rules 403 and 404(b). *Id*. at (¶25). The supreme court found the testimony admissible

18

because it was presented not to show Simmons's character, but rather "as an integral part of the story for the purpose of showing intent and establishing motive." *Id.* at 716 (¶31). Also, the supreme court found the trial court properly determined the testimony was more probative than prejudicial, as it showed Simmons's state of mind and motive. *Id.* at (¶34).

¶42. Chambers's testimony was probative as to Affleck's state of mind, intent, and motive for the murder. And it was an integral part of the story—not only to show state of mind, intent, and motive, but also to explain Chambers's testimony that Affleck "[was]n't supposed to be[] over there." We cannot find the trial court abused its discretion in allowing Chambers's testimony as to the 2009 incidents.

### V. Felon in Possession of a Firearm

¶43. Affleck argues the evidence was insufficient to support his felon-in-possession-of-a-firearm conviction.

¶44. "[T]o sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict," the evidence must be sufficient to show "beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]" *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005). The evidence must be considered in the light most favorable to the State. *Id.*

¶45. It is unlawful for a person convicted of a felony to possess a firearm. Miss. Code Ann. § 97-37-5(1) (Rev. 2014). It was stipulated at trial that Affleck was a convicted felon. Thus, the only element of the charge before the jury was whether Affleck possessed a

19

firearm. Police found a 20-gauge Mossburg shotgun in the shed in Affleck's backyard. The State proceeded under a theory of constructive possession, since there was no evidence Affleck was in actual possession of the shotgun.

¶46. To prove constructive possession, the evidence must show "the defendant was aware of the presence and character of the particular item and was intentionally and consciously in possession of it." *Short v. State*, 929 So. 2d 420, 427 (¶21) (Miss. Ct. App. 2006) (quoting *Gavin v. State*, 785 So. 2d 1088, 1093 (¶16) (Miss. Ct. App. 2001)). "Constructive possession may be established with proof that the item was under the defendant's dominion or control." *Id.* Proximity to the item is a factor, but is not determinative. *Hopkins v. State*, 141 So. 3d 384, 390 (¶16) (Miss. 2014). A rebuttable presumption of constructive possession exists when one owns the premises where the item is found. *Dixon v. State*, 953 So. 2d 1108, 1113 (¶12) (Miss. 2007).

¶47. The State introduced the deed to Affleck's home on Creston Avenue to prove that he was the home's owner at the time of his arrest, thus creating a rebuttable presumption of constructive possession. At the time of Affleck's arrest on May 23, 2011, he was standing within close proximity of the shed, which had blood on it. Although Affleck points out that he lived at the home with multiple roommates, no evidence was presented that the shotgun belonged to anyone other than Affleck. Affleck failed to present any evidence to rebut the presumption that he constructively possessed the shotgun.

¶48. Considering the evidence in the light most favorable to the State, we find that a reasonable jury could have found Affleck was in constructive possession of the shotgun

beyond a reasonable doubt. This issue is without merit.

*VI. Retroactive Misjoinder*

¶49. The doctrine of retroactive misjoinder states that "if the defendant can show that he suffered clear and compelling prejudice as a result of the evidence introduced to support the vacated count, he is entitled to a new trial on the remaining count(s)." *Thomas v. State*, 126 So. 3d 877, 878 n.1 (Miss. 2013) (quoting *Williams v. State*, 37 So. 3d 717, 721 (¶9) (Miss. Ct. App. 2010)). Affleck argues that because the felon-in-possession-of-a-firearm count should have been vacated due to lack of evidence, the evidence introduced in support of this charge prejudiced his defense to murder.

¶50. As we have found sufficient evidence to support Affleck's felon-in-possession-of-a-firearm conviction, we find no merit to this argument.

*VII. Harmless Error*

¶51. Affleck argues that none of the cited errors can be considered harmless. There is no merit to this argument. The State presented substantial evidence against Affleck. With regard to the issues raised, any error at trial, if any is found, was harmless given the overwhelming evidence against Affleck.

*VIII. Cumulative Error*

¶52. Affleck argues cumulative errors require reversal. The cumulative-error doctrine states "that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss.

2007). We have found no individual errors, and we find no cumulative errors requiring reversal. This issue is without merit. Affleck's convictions are affirmed.

¶53. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TWO CONSECUTIVE TERMS OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**BARNES, ISHEE, CARLTON, FAIR, JAMES AND WILSON, JJ., CONCUR. GRIFFIS, P.J., AND MAXWELL, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.**